UNITED STATES of America,
Plaintiff–Appellee,

v.

Manuel FLORES, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Juan Raul GARZA, Defendant–Appellant.

Nos. 93–7388, 93–7662.

United States Court of Appeals,
Fifth Circuit.

Sept. 1, 1995.

Richard Hoffman (Court-appointed), Brownsville, TX, for appellant in No. 93–7388.

D.R. Millard, III, Paula Offenhauser, Asst. U.S. Attys., Gaynelle Griffin Jones, U.S. Atty., Houston, TX, in No. 93–7388.

Douglas M. McNabb (Court-appointed), Philip H. Hilder (Court-appointed), Houston, TX, David Bruck, Columbia, SC (Allowed to argue for appellant but not appointed counsel under CJA), Columbia, SC, for appellant in No. 93–7662.

Paula C. Offenhauser, Asst. U.S. Atty., Houston, Gaynelle Griffin Jones, U.S. Atty., Brownsville, TX, for appellee in No. 93–7662.

Before DAVIS, SMITH and WIENER, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

In this consolidated appeal both Juan Raul Garza and Manuel Flores challenge their convictions and sentences. Juan Raul Garza was convicted of five violations of various drug trafficking laws [1], operating a continu-

---

1. Count 1: conspiracy to import more than 1,000 kilograms of marijuana into the U.S. from Mexico, 21 U.S.C. §§ 963, 952(a)(2) and 960(b)(1)(G);

Count 2: conspiracy to possess with intent to distribute more than 1,000 kilograms of marijua-

na, 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A)(vii);

Count 3: possession with intent to distribute approximately 163.6 kilograms of marijuana, 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(vii); 18 U.S.C. § 2;

ing criminal enterprise (CCE) [2], money laundering [3], and three counts of killing in furtherance of a CCE.[4] After a punishment hearing, the same jury recommended a death sentence for the three killings. Accordingly, the court sentenced Garza to death for counts 7, 8, and 9, and to concurrent terms of imprisonment for life (counts 1, 2, and 6), 40 years (counts 3 and 5) and 20 years (counts 4 and 10). Garza challenges both his conviction and his sentence.

At a separate trial, Manuel Flores was convicted of two counts of killing in furtherance of Garza's CCE [5], one count of conspiring to import over 1,000 kilograms of marijuana [6], and one count of possession with intent to distribute over 1,000 kilograms of marijuana [7]. Flores was sentenced to life imprisonment for each murder count and to 327 concurrent months' imprisonment for the other counts. We find no reversible error and affirm.

## I. FACTS

From the early 1980's until 1992, Juan Raul Garza built and controlled an intricate drug trafficking enterprise. Working with friends and associates from the tough neighborhood of his youth, Garza sold thousands of pounds of marijuana in Texas, Louisiana and Michigan, reaping hundreds of thousands of dollars in return. Garza originally bought from a supplier who imported the marijuana into the United States for him, but eventually he sent his own workers into Mexico to buy the drug and drive it across the border.

Garza occasionally suffered setbacks when loads of marijuana or cash were seized by law enforcement agencies. In addition to putting a dent in Garza's profit margin, these incidents made him suspicious that certain of his workers and associates were cooperating with the police. Being the object of Garza's mistrust was not a healthy condition—as the victims of Garza's three murder convictions would attest.

Gilberto Matos was the first of the three to be killed. Matos was an associate of Erasmo De La Fuente, a drug smuggler who worked with Garza. Garza suspected that De La Fuente had tipped off the police about a 1,350 pound shipment of marijuana that had been seized from one of Garza's storage houses. Garza commissioned some of his workers to murder De La Fuente, but they ran into trouble because De La Fuente was continually surrounded by a small entourage, which included Matos. When his patience wore thin, Garza ordered Manuel Flores and Israel Flores to break into Matos' auto repair shop and lie in wait for either De La Fuente or Matos. If only Matos appeared, they were to kill him as a forewarning to De La Fuente. When the unlucky Matos arrived at his shop alone, Israel and Manuel made him lie face down on the floor and waited about 45 minutes in case De La Fuente might show up. When their wait proved fruitless, Manuel shot Matos in the back of the head. For their work, Garza paid Israel and Manuel with cash and a car.

But Garza did not abandon his plans to murder De La Fuente. Five months later, Garza supplied Israel Flores and Jesus Flores with guns and took them to De La Fuente's nightclub to kill him.[8] Nervous, Israel consumed too much liquor to help with the murder and had to be dropped off in an alley. Jesus picked up Manuel Flores and they went back to the nightclub. When De

---

Count 4: possession with intent to distribute approximately 95.4 kilograms of marijuana, 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); 18 U.S.C. § 2;
Count 5: possession with intent to distribute approximately 596.3 kilograms of marijuana, 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(vii); 18 U.S.C. § 2.

**2.** Count 6: 21 U.S.C. §§ 841(a), 848(c) and 848(e)(1)(A); 18 U.S.C. § 2.

**3.** Count 10: 18 U.S.C. § 1956(a)(1)(A)(i) and 18 U.S.C. § 2.

**4.** Counts 7, 8 and 9: 21 U.S.C. §§ 848(a), 848(c) and 848(e); 18 U.S.C. § 2.

**5.** 21 U.S.C. §§ 848(a), 848(c), 848(e) and 18 U.S.C. § 2.

**6.** 21 U.S.C. §§ 963, 952(a)(2) and 960(b)(1)(G).

**7.** 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A)(vii).

**8.** Manuel and Jesus are brothers and Israel is their cousin.

La Fuente left the club and got into his car, Manuel shot him twice through the driver's window. Jesus fired shots into the air to distract the police from chasing Manuel, hid in a ditch for a few hours, then called Garza, who picked him up. Garza paid each of the Flores brothers $10,000. The third victim was Thomas Rumbo. After surveillance officers watched Rumbo help load marijuana into a trailer, they stopped him and told him what they had seen. Rumbo agreed to cooperate and turned the entire 360 pound shipment over to the officers. Rumbo tried to disguise his infidelity by cutting a hole in the fence surrounding the trailer and telling one of Garza's associates that the drugs had been stolen. Not fooled, Garza figured that Rumbo had stolen his merchandise and went directly to Rumbo's house, taking two of his workers with him. Rumbo reluctantly got into Garza's pickup truck and they drove to another worker's house, where Garza picked up a gun. They stopped again at Jesus Flores' house and Jesus, who owed Garza money for cocaine, volunteered to go along. All five got into Jesus' car and they drove around while Jesus interrogated Rumbo. Rumbo stuck to his story, so they drove out to a rural farm road and Garza told Rumbo that he knew Rumbo had taken the marijuana. Rumbo was told to get out of the car and to walk home. Rumbo protested that he was wearing new shoes but then climbed out. Garza shot Rumbo in the back of the head and Rumbo fell back into the car. Garza and Jesus lugged Rumbo's body out into the brush and Garza shot him four more times.

Gradually, law enforcement agents tightened the net around Garza's operations. They tapped Garza's phone and surveilled his activities, seized more loads of drugs and money, arrested some of his workers and converted others into informants. At one point, Garza himself was arrested after making a delivery to an undercover agent. In February 1992, the U.S. Customs Service mounted a sweeping interstate offensive, using an assault helicopter, hundreds of agents and a S.W.A.T. team to secure and search the homes of Garza and his workers. As a result of this raid, most of Garza's associates were indicted and arrested. Garza himself fled to Mexico and could not be found.

The authorities finally located Garza when he ran low on money and phoned one of his Michigan associates to arrange a sale. Unknown to Garza, this person was cooperating with the government and allowed agents to tape record his conversations with Garza. Agents traced the calls and contacted the Mexican government, which apprehended Garza and turned him over to the U.S. Customs Service.

Following the February 1992 raid, Garza and fifteen of his co-conspirators were originally indicted with two drug trafficking counts. While Garza was a fugitive, the government made plea agreements with most of these co-conspirators. In exchange for their testimony against Garza, the government allowed them to plead to lesser charges and promised to recommend substantially reduced sentences. After the plea agreements, Garza was reindicted with the ten counts described above. Several months before Garza's trial, Manuel Flores was tried and convicted of the murders of Gilberto Matos and Erasmo De La Fuente.

We turn now to a consideration of the issues Garza raises in this appeal.

## II. JUAN RAUL GARZA

As required by 21 U.S.C. § 848, Garza's trial was divided into a guilt phase and a punishment phase. Garza raises several complaints about both phases of his trial; we will address the guilt phase issues first.

### A. JURY SELECTION

■ For several reasons, Garza maintains that the district court conducted voir dire in such a way as to deprive him of critical information about the potential jurors' views on capital punishment. The Supreme Court has recently reminded us that:

Voir dire is conducted under the supervision of the court and a great deal must, of necessity, be left to its sound discretion. Even so, part of the guaranty of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors. Voir dire plays a critical function in assuring the criminal defendant that his

[constitutional] right to an impartial jury will be honored.

Hence, the exercise of [the trial court's] discretion, and the restriction upon inquiries at the request of counsel, [are] subject to the essential demands of fairness.

*Morgan v. Illinois,* 504 U.S. 719, 729–30, 112 S.Ct. 2222, 2230, 119 L.Ed.2d 492, 503 (1992). On appeal, we will not disturb the scope and content of voir dire without a showing that there was insufficient questioning to allow defense counsel to exercise a reasonably knowledgeable right of challenge. *United States v. Shannon,* 21 F.3d 77, 82 (5th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 260, 130 L.Ed.2d 180 (1994); *United States v. Rodriguez,* 993 F.2d 1170, 1176 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1547, 128 L.Ed.2d 197 (1994).

1. Did the district court err by limiting voir dire?

█ At the district court's behest, the parties submitted an agreed proposed procedure for jury selection. The parties suggested that the clerk send the venire a 19–page questionnaire, which included questions on a juror's beliefs about the death penalty. The parties further suggested that the court question the venire as a group about most issues and question jurors individually about their attitudes toward the death penalty and their exposure to pre-trial publicity; Government and defense counsel would then be given five or ten minutes per juror to ask follow up questions on these subjects.

Before jury selection, the district court informed counsel that it would not permit such a long questionnaire to be submitted and that in particular, it would not allow the potential jurors to be questioned through the mail about their attitudes toward capital punishment. Instead, the court approved a two page questionnaire covering general facts about jurors' backgrounds. The court also stated that it would allow individual sequestered voir dire about the death penalty and publicity, but only of those jurors whose responses to general questions indicated that they had a problem in either area. The court ruled that it would give two hours to each side (later expanded to three) to question jurors about any topic they wished. After this conference, Garza again asked the court to permit him to examine each juror on the death penalty and publicity. The court denied this request.

Garza argues that in light of the parties' agreement to follow this procedure, the court erred in refusing to allow him to question each juror on the capital punishment issue. Garza emphasizes that jurors may be particularly reluctant to volunteer their opinions on such a personal and emotional topic as capital punishment and argues that individual questioning would be more likely to elicit honest and detailed responses. Garza also complains that the district court unduly restricted the questions he could ask about capital punishment and the time in which he had to ask them.

█ Although we are sympathetic to Garza's concerns, our role is not to decide what voir dire procedure is best, but to determine whether the procedure chosen by the district court is sufficient. To do this, we ask " 'whether the procedure used … created a reasonable assurance that prejudice would be discovered if present.' " *United States v. Quiroz–Hernandez,* 48 F.3d 858, 868 (5th Cir.1995) (quoting *United States v. Nell,* 526 F.2d 1223, 1229 (5th Cir.1976)). When measured against this standard, we are convinced that the voir dire was adequate.

First, our careful review of the record shows that the group voir dire was sufficient to identify those jurors who needed to be questioned further about the death penalty. The court first asked jurors to identify themselves if they were opposed to the death penalty or would automatically impose the death penalty. The court followed this with several other questions about capital punishment and encouraged all the jurors to ask any questions they had. The court then privately questioned in more detail the members of the panel who responded. The court's questions were carefully designed to put the jurors at ease and encourage them to respond fully, and the jurors' answers reflect that the court was successful in obtaining a free flow of information from the venire. The next day, the court permitted each side

to question the jurors for three hours. Both the government and Garza asked the venire about their feelings toward specific aggravating and mitigating factors and about the penalty process. These questions also elicited frank responses from the venire. Throughout voir dire, when a juror came forward with an answer suggesting bias, the court questioned the juror separately and individually and most often allowed counsel to ask questions as well.

Garza makes the related complaint that the court did not allow him enough time to question each juror about the death penalty and instructed him not to ask certain questions. Our review of the record leads us to conclude that the time and questions allowed were adequate. Although Garza lists a number of questions that the court disapproved, the record reveals that the court actually allowed Garza a great deal of latitude in his questioning of individual jurors. Lastly, because our review of the specific questions Garza wished to ask shows that they were not reasonably necessary to enable Garza to challenge jurors over their views on capital punishment, we conclude that the court did not abuse its discretion in limiting them. *Quiroz–Hernandez,* 48 F.3d at 869.

As a whole, the court's plan to question the venire as a group, to allow individual sequestered questioning of jurors who came forward and to permit each side an additional three hours of virtually unrestricted questioning was not an abuse of discretion. *See United States v. Guy,* 924 F.2d 702, 707–08 (7th Cir.1991) (court did not err by conducting similar group voir dire on racial prejudice). Although not every juror was ultimately questioned individually, the record reflects that the two day voir dire reasonably assured that the jurors' potential biases were uncovered and explored.[9]

9. We are unsure whether Garza means to challenge the court's failure to individually question each juror about pretrial publicity. However, our review of the record discloses that the group questioning on this topic elicited a large number of responses and that the court followed this up with thorough individual questioning of the responding jurors. We see no abuse of discretion on this issue, either.

2. Did the court err by refusing to permit Garza to individually question Venire Members No. 11 and No. 19?

██ Garza maintains that the court erred by dismissing jurors No. 11 and No. 19 for their opposition to the death penalty without allowing him a sufficient opportunity to rehabilitate them. These jurors both responded when the court initially asked who was "against" the death penalty. When the court asked the follow-up question whether they could "envision any setting, any case, not this one, any case, that is just so heinous and so terrible and so horrible, could you envision any case, in which you could find yourselves voting for the death penalty," both of these jurors unequivocally responded that they could not (in contrast to a number of other "opposed" jurors who stated that they could). The court then asked if these jurors could put aside their personal feelings and "still follow the law," and again they responded that they could not under any circumstances. The court denied Garza's request to question No. 11 and No. 19 further and excused these jurors as having "resoundingly" stated their disability in a capital case. We see no error in the court's excusal of these jurors. The district court, who observed these jurors and heard their emphatic answers to his questions, was entitled to conclude that further examination by counsel was pointless.

3. Did the court err by dismissing for cause jurors opposed to the death penalty?

██ Garza contends next that the district court erred by dismissing for cause four jurors who indicated that they could not impose the death penalty in his case. A district court properly excuses a juror for cause when:

the juror's views [on the death penalty] would prevent or substantially impair the performance of his duties as a juror in

Garza also criticizes the court for refusing the proposed questionnaire and for substituting one that contained no questions on the death penalty or pretrial publicity. However, because the court provided for adequate questioning on all issues during jury selection, the court's limitation on the questionnaire was not an abuse of discretion.

accordance with his instructions and his oath.

*Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); *Williams v. Collins,* 16 F.3d 626, 633 (5th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 42, 129 L.Ed.2d 937 (1994). This standard does not require the court to dismiss only those jurors who would automatically vote against the death penalty in every case. Stated differently, the trial court has the discretion to excuse a juror when it "is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Witt,* 469 U.S. at 426, 105 S.Ct. at 853. We give considerable deference to the court's decision to excuse a juror on this basis, because such decisions are based in large part on its face-to-face credibility assessment of the prospective jurors. *See id.,* at 426–29, 105 S.Ct. at 853–55 (although in habeas context, discussing universal reasons for deference); *United States v. Bryant,* 991 F.2d 171, 174 (5th Cir.1993) (decision to excuse juror for actual bias reviewed for manifest abuse of discretion).

■ We first apply this standard to the court's dismissal of jurors Ms. Nieto and Ms. Martinez. After thorough questioning by the district court and counsel, both jurors stated that they would only impose the death penalty if the defendant had abused and murdered a very small child.[10] Both jurors were unequivocal and the more the district court tested their beliefs, the more adamant they became in their opposition to voting for death in any other case. In these circumstances, the court did not abuse its discretion by deciding that these jurors held beliefs that would substantially impair them from performing their duties as jurors. *Russell v. Collins,* 998 F.2d 1287, 1293 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1236, 127 L.Ed.2d 580 (1994) (juror might impose death only if victim was small child); *Bell v. Lynaugh,* 828 F.2d 1085, 1092 (5th Cir.), *cert. denied,* 484 U.S. 933, 108 S.Ct. 310, 98 L.Ed.2d 268 (1987) (juror might impose death only if victim was a family member); *Antwine v. Delo,* 54 F.3d 1357, 1369 (8th Cir.1995) (willingness to consider death in extreme hypothetical situations does not render [potential jurors] immune from exclusion for cause).

■ The third member dismissed was Mr. Narup, who told the court that he could only impose death if the defendant had confessed to the murder or if Mr. Narup himself had witnessed it.[11] Garza argues that the court

---

**10.** Ms. Nieto stated that she could only impose the death penalty if the case "involved a rape and the murder of a small child two or three years old." When the court questioned her further, she said "Under no other circumstances. Only if it involved a small child." Later, when the court asked Ms. Nieto if she could follow the law, she replied, "Oh, I would only follow the law if it involved a case such as I stated; otherwise, no." The court then sustained the government's for-cause challenge.

Ms. Martinez initially told the court that she was not in favor of the death penalty, no matter how terrible the crime. When the court asked her about a hypothetical case involving the abuse of a three year old child, she stated that she might change her mind if the victim was a child. The court asked if she could envision imposing death in any other case and she replied that she could not. The court then proposed the murder of a 20 year old disabled victim who was abused and murdered and Ms. Martinez answered, "When I say the death penalty, it makes me shake my body all over." After persistent questioning from the court and counsel, Ms. Martinez apparently became distraught and said, "It is very hard for me to answer because it is the same question. Death penalty." After the court noted several times on the record that Ms. Martinez was becoming emotional it gently excused her.

**11.** Mr. Narup stated that he would not be able to believe even an eye witness to a murder. As Mr. Narup himself put it, "They make erasers on pencils but they don't make an antidote for a lethal injection." The court carefully explained the reasonable doubt standard and Mr. Narup responded:

I would probably always have a reasonable doubt. That is the problem. Again, ... I am not strict against the death penalty. If I saw somebody committing a murder and I had a gun, I would shoot him. I am not against that, but I am against shooting the guy whenever he may not have done it. Somebody else comes over and said he did it. I don't know that he did or not. I don't know this guy's motives. I would have a reasonable doubt in my head. Defense counsel attempted to rehabilitate Mr. Narup by asking whether he could sit in judgment of a defendant who had killed the President, to which Mr. Narup retorted, "If Oswald hadn't been shot they would have executed him, wouldn't they? Right now they still don't know whether he did it or not."

inappropriately dismissed Mr. Narup because "it is up to each individual citizen to judge for himself the degree of proof of guilt beyond a reasonable doubt." However, Mr. Narup did not say that he would hold the government to a high standard; rather, he indicated that he would hold the government to an impossible standard. Essentially, Mr. Narup told the court that if the defendant's life was at stake, no degree of proof would be sufficient. The district court did not abuse its discretion in concluding that Mr. Narup would be unable to follow its instructions. *See Drew v. Collins,* 964 F.2d 411, 417 (5th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 3044, 125 L.Ed.2d 730 (1993) (proper to excuse juror who would hold government to higher standard than reasonable doubt).

■ Lastly, we consider the court's excusal of Mr. Flores. Mr. Flores originally did not indicate that he was opposed to the death penalty. Later, Mr. Flores apparently became aware that some of the victims in the case had been involved in drug trafficking and informed the court that he could never vote for the death penalty in any case in which the victim was involved with drugs. The court attempted to steer Mr. Flores away from considering these particular circumstances of Garza's trial, but Mr. Flores persisted. After further questioning, Mr. Flores agreed with the government's statement that "if the person who is killed is another drug dealer or a competitor or somebody else who is in the same organization or something like that, in those situations [he] would never consider the death penalty, [and] would never impose the death penalty." The following discussion ensued:

GOVT: In other words, if [the victim] was a person who was in drugs … and the law says whether or not the person— whether or not the victim is one, you should still be able to consider assessing the death penalty, you would not be able to follow that law.

FLORES: I would not be able to give the death penalty to someone that is in the same thing that he [Garza] is doing. They are both in drugs.

COURT: Let's ask it this way. Let us say that the law does not distinguish wheth-

er the person that was killed was in drugs or not in drugs. Are you saying that under no circumstances, if he was, that you could not follow that law and give death under those circumstances?

FLORES: Right, that is what I am saying.

After repeating several more times that he could not impose death in a drug-related killing, Mr. Flores was excused.

■ As Garza points out, Mr. Flores was in a slightly different position than Ms. Nieto and Ms. Martinez. Rather than identifying the only case in which he *could* impose death, Mr. Flores indicated that only in a case like Garza's could he *not* impose death. Garza contends that this difference is one of constitutional dimension; that even if *Witt* permits the court to dismiss Ms. Nieto and Ms. Martinez, it does not support the dismissal of Mr. Flores. We cannot agree. While the process of qualifying jurors to sit in a capital case is of particular importance, "[h]ere, as elsewhere, the quest is for jurors who will conscientiously apply the law and find the facts." *Witt,* 469 U.S. at 423, 105 S.Ct. at 851–52. The district court is not limited to disqualifying only those jurors who would never vote for the death penalty, *id.* at 421, 105 S.Ct. at 850–51, but can excuse those who cannot set aside their own predilections in deference to the rule of law. *Lockhart v. McCree,* 476 U.S. 162, 176, 106 S.Ct. 1758, 1766–67, 90 L.Ed.2d 137 (1986).

In Mr. Flores' case, the source of his bias was not the death penalty in the abstract, or in some irrelevant hypothetical case. Mr. Flores volunteered that he would not be able to overcome his bias and vote in favor of the death penalty where the victim was a co-conspirator in a drug trafficking case. The district court was not required to ignore this bias and did not abuse its discretion by excusing Mr. Flores.

4. Did the court err by denying Garza's for-cause challenges to certain jurors?

During voir dire, Garza challenged for cause two jurors for their exposure to pretrial publicity and six for their relationships to government witnesses and law enforce-

ment officers.[12] The district court denied these challenges.

### a. Pretrial publicity

■ Garza contends that the district court erred by not excusing Ms. Esparza and Mr. Krell, both of whom had heard some publicity about Garza's upcoming trial. Ms. Esparza told the court that she had seen a recent article in the newspaper that had mentioned that Garza was to be tried for drug trafficking. She did not remember any reference to alleged killings or deaths. When the court asked her if the article had caused her to form an opinion, she stated that it had, "[b]ecause there is so much of that [drugs] in our community. And we have so many young children. And I have grandchildren." When the court asked if she would have trouble being fair and impartial in a drug case, she replied "But I don't have the facts, you see. I would have to see what exactly is presented and then I would be able to." After thorough questioning, Ms. Esparza assured the court that she could be fair, that she did not already believe that Garza was guilty and that she would only make a determination after all the facts had been presented to her. Lastly, the court asked her if, despite the article, she could view the evidence with a clean and open mind, and she replied that she could.

Mr. Krell informed the court that he had been in a scuba diving class with Thomas Rumbo twenty years earlier and had heard that he had been shot. Mr. Krell stated that he had not known Rumbo personally and had not heard anything further about his death. When the court asked Mr. Krell if he had any information about how Rumbo had died, Mr. Krell responded "I don't know anything about what happened." During a number of follow-up questions, Mr. Krell said that he

would be able to be impartial and that he could make a decision based solely on the evidence.

■ As we have previously stated, "[a] person is not automatically rendered unqualified to serve as a juror merely because he has been exposed to media coverage of the charged crime. The issue becomes whether exposure to media publicity will preclude the individual from returning a verdict based solely on the person's application of the law as stated to the evidence presented." *Bell*, 828 F.2d at 1093. The district court must decide this question after observing "the demeanor and response of the prospective jurors and [evaluating] any possible prejudice." *United States v. Doggett*, 821 F.2d 1049, 1051 (5th Cir.1987). We will only second-guess the court's decision that a juror is unbiased if there is an abuse of discretion. *Id.*

We see no abuse of discretion in the court's conclusion that neither Ms. Esparza nor Mr. Krell was biased by what they had heard. The court carefully and thoroughly questioned both jurors and allowed counsel to question them as well. The court was entitled to find that these panel members were not tainted by media coverage and were able to serve as jurors.[13]

### b. Law enforcement connections

■ Garza also argues that the court should have excused a number of jurors who were acquainted with government witnesses or members of law enforcement. Garza complains about Ms. Scheiner, who was a friend of Jim Parker, a potential government witness from the district attorney's office[14]; Ms. Casas, who had several distant connec-

---

**12.** Only two of these venire members went on to serve as jurors. However, the record does not reveal whether Garza had to use peremptory challenges to have the others excluded.

**13.** In a footnote, Garza asserts that the district court's denial of his motion for a change of venue was an abuse of discretion. Garza has pointed to nothing in the record in support of this argument; thus, we find that Garza has insufficiently presented this issue for review. *McKethan v. Texas Farm Bureau*, 996 F.2d 734,

739 n. 9 (5th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 694, 126 L.Ed.2d 661 (1994).

**14.** Ms. Scheiner stated that her children had grown up with Parker's and that during that time, she travelled with Parker's wife to Mexico. Ms. Scheiner also clarified that in the past ten years, their children had gone separate ways and it had been a long time since she had seen Parker.

tions to law enforcement [15]; Mr. Robles, who had friends who worked for law enforcement and knew a government witness [16]; Mr. Guevara, who worked at the Cameron County tax office and knew several witnesses [17]; Mr. Medill, who was friends with several police officers that he saw every three or four months; and Mr. Moreno, who was friends with a law enforcement witness but had not seen him in two years. The district court specifically found that Guevara, Medill and Moreno would not bring any pro-law enforcement bias to their jobs as jurors and denied Garza's challenges to all six of these jurors.

■ Again, we review the court's determination of a juror's actual bias only for manifest abuse of discretion. *Bryant*, 991 F.2d at 174. After carefully reviewing the voir dire record, we conclude that the court did not err.

## B. TAPE RECORDINGS

1. Did the court err by admitting tape recorded conversations?

For two reasons, Garza contends that the district court should have excluded four tape recorded conversations between himself and a co-conspirator, Daniel Bordayo. Bordayo had been arrested in the February 1992 raid on Garza's operations and had pled guilty to several drug-related charges. Bordayo got word that Garza was trying to contact him from Mexico, in hopes of raising cash and revitalizing his decimated drug enterprise. Bordayo volunteered this information to the government and consented to having the phone calls with Garza recorded. The record reveals that the government's primary objective was to learn Garza's whereabouts by tracing these calls. At trial, the government introduced four of these tape recorded conversations, in which Garza proposes a sale of "commodities" and discusses the details with Bordayo.

■ First, Garza contends that the government violated his Sixth Amendment right to counsel by using Bordayo to elicit incriminating statements following his February 1992 indictment. However, Garza did not raise this objection below. The record reveals that Garza instead objected on grounds that the conspiracy had ended when the statements were made. Thus, we apply the plain error standard. *United States v. Calverley*, 37 F.3d 160 (5th Cir.1994).

The district court's decision to admit these tapes was not plain error. Assuming without deciding that Bordayo was acting as a government agent, Garza has not met his burden of showing either that the admission of the tapes affected the outcome of his proceedings or that it seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Calverley*, 37 F.3d at 164. These tapes were conceivably relevant only to Counts One and Two (conspiracy to import marijuana and conspiracy to possess with intent to distribute). The government offered overwhelming evidence on these charges, including testimony from numerous cooperating conspirators and law enforcement agents, supported by many items of seized physical evidence and photographs. Given the many legs upon which the guilty verdicts stood, Garza's general assertion that the tapes prejudiced the jury against him is insufficient.

■ Garza next argues that both his and Bordayo's statements were inadmissible hearsay because they were not made in furtherance of the conspiracy. This argument is entirely meritless, because Garza's statements were admissible not as co-conspirator statements but as the admissions of a party-opponent. Fed.R.Evid. 801(d)(2)(A); *United States v. Clemons*, 676 F.2d 122, 123 (5th Cir.1982). Bordayo's statements were recip-

15. Ms. Casas had children who grew up with the children of Luis Romero, a witness from the Texas Department of Public Safety; had a niece-in-law whom she thought worked for Immigration and whom she had not seen in three or four years; and had relatives on various police forces.

16. Mr. Robles had friends who worked for Immigration, the Brownsville Police Department, and

as a Justice of the Peace. He also knew Tony Torres, a prosecution witness, but stated that he would not give his testimony any greater weight.

17. Mr. Guevara worked in the same building as Tony Torres, had gone to school with one witness and was a cousin of another.

rocal and integrated utterances and were admissible to put Garza's own statements in context. *United States v. Gutierrez–Chavez,* 842 F.2d 77, 81 (5th Cir.1988). Even if Garza could no longer conspire with Bordayo, because Bordayo had been arrested, Garza's statements were also relevant and admissible to confirm the earlier conspiracy.[18] *United States v. Goff,* 847 F.2d 149, 168 n. 27 (5th Cir.), *cert. denied,* 488 U.S. 932, 109 S.Ct. 324, 102 L.Ed.2d 341 (1988).

2. Did the district court err by allowing non-expert witnesses to testify as to certain tape recordings?

Garza maintains that the court erred by allowing three members of the conspiracy, Angel Berndt Garcia, Jesus Flores and Daniel Bordayo, to testify about the parties to and meanings of tape recorded conversations between other conspirators.

▮ Garza first complains that the district court allowed Berndt Garcia to testify about several conversations even though he could only identify one of the speakers. Garza's characterization is not quite accurate. While Berndt Garcia could only identify one of the speakers (Garza) with absolute certainty, he did identify the other speaker, although with less certainty. In such cases, the district court is given broad discretion to admit the tape and let the jury decide what value to place on the identification. *United States v. Singh,* 922 F.2d 1169, 1174 (5th Cir.), *cert. denied,* 500 U.S. 938, 111 S.Ct. 2066, 114 L.Ed.2d 471 (1991) (conclusive proof of authenticity not required to admit disputed evidence); *United States v. Lance,* 853 F.2d 1177, 1181 (5th Cir.1988) (once minimally authenticated, issue becomes weight of evidence, not admissibility). The district court did not abuse its discretion in admitting this tape.

▮ Garza next argues that these co-conspirators should not have been allowed to explain the secret meanings of the conversations both because they are not experts and

because the meaning was already clear. Fed.R.Evid. 701 allows lay witnesses to testify about conversations consisting of "unfinished sentences and punctuated with ambiguous references to events that are clear only to [the participants]." *United States v. De Peri,* 778 F.2d 963, 977 (3d Cir.1985), *cert. denied,* 475 U.S. 1110, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986). The district court may admit such opinions if they are (a) rationally based on first hand knowledge and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue. *United States v. Garcia,* 994 F.2d 1499, 1506–07 (10th Cir.1993) (agent who tapped phone conversation between conspirators could testify about hidden meanings); *United States v. Simas,* 937 F.2d 459, 462 (9th Cir.1991). In Garza's case, the witnesses met these criteria.

By listening to the tapes, the conspirators gained first hand knowledge of these conversations, which were admissible as co-conspirator statements in furtherance of the conspiracy. *Garcia,* 994 F.2d at 1507 (in-court perception of admissible out of court statements constitutes first hand knowledge). Their opinions had a rational connection to this factual basis because they were members of the conspiracy and familiar with the events being discussed. The district court ensured this rational connection by repeatedly instructing the witnesses to testify only to what they actually knew, thus preventing speculation and inference.

The co-conspirators' testimony was also helpful to the jury because, contrary to Garza's assertion, these tapes did not always speak for themselves. Hoping to disguise the topic of discussion, the conspirators peppered their discourse with code phrases and oblique references.[19] The witnesses' testimony on the true meaning of these phrases was helpful, if not essential, to the jury's understanding of this evidence. The district court policed this testimony and, for the most part, kept the government from asking about seg-

---

18. For this same reason the court correctly overruled Garza's objection that these statements were irrelevant.

19. For example, one conspirator told Garza "The comrade, the one who doesn't drink, is over there looking at the nest." Berndt Garcia testified that this meant that another conspirator was out surveying a landing strip for Garza's plane.

ments of the conversations that were easily understood. *See De Peri*, 778 F.2d at 978. In such circumstances, the district court did not abuse its discretion by allowing the co-conspirators to testify about the meaning of the tapes for the jury. *Garcia*, 994 F.2d at 1507.

## C. THE TRIAL COURT'S ROLE

Garza argues that the district court erred by acting as an advocate for the government throughout his guilt and punishment hearings. To constitute error, "the district judge's actions, viewed as a whole, must amount to an intervention that could have led the jury to a predisposition of guilt by improperly confusing the functions of judge and prosecutor." *United States v. Bermea*, 30 F.3d 1539, 1569 (5th Cir.1994), *cert. denied*, — U.S. —, 115 S.Ct. 1113, 130 L.Ed.2d 1077 (1995). To meet this test, "the judge's intervention must be quantitatively and qualitatively substantial." *Id.*

Garza complains of two instances in which the district court elicited evidence from witnesses that was harmful to him. First, he complains that the district court elicited harmful information from the government's pathologist, Dr. Lawrence Dahm. Second, Garza complains that the court impeached Elizabeth Murillo, a psychotherapist who testified as Garza's expert mitigation witness. We have carefully reviewed the record of the exchanges the district court had with these witnesses and find that the court did not exceed its proper role in either incident.[20]

## D. COUNT TEN

1. Was Count Ten of the indictment sufficient?

Garza contends that Count Ten of the indictment did not sufficiently allege a violation of 18 U.S.C. § 1956(a)(1)(A)(i), the money-laundering statute. Garza repeatedly asked the district court to dismiss this count, but the district court denied his requests. Count Ten alleged:

On or about November 14, 1989 ... the Defendant, JUAN RAUL GARZA, with the intent to promote the carrying on of drug dealing in violation of Title 21, United States Code, Sections 846 and 841(a)(1), and knowing that approximately $273,-644.00 in United States currency in fact represented the proceeds of that unlawful drug dealing, conducted and attempted to conduct a financial transaction with that money in that the Defendant attempted to *move that money.*

Garza asserts that the indictment fails because the phrase "move that money" does not state an act that constitutes a financial transaction.

We review the sufficiency of the indictment de novo. *United States v. West*, 22 F.3d 586, 590 (5th Cir.), *cert. denied*, — U.S. —, 115 S.Ct. 584, 130 L.Ed.2d 498 (1994). We will find that the indictment is sufficient if it "(1) enumerates each prima facie element of the charged offense, (2) notifies the defendant of the charges filed against him, and (3) provides the defendant with a double jeopardy defense against future prosecutions." *United States v. Nevers*, 7 F.3d 59, 62 (5th Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 1124, 127 L.Ed.2d 432 (1994). We will not reverse Garza's conviction for minor deficiencies in the indictment that caused no prejudice. *United States v. Shelton*, 937 F.2d 140, 142 (5th Cir.1991), *cert. denied*, 502 U.S. 990, 112 S.Ct. 607, 116 L.Ed.2d 630 (1991).

While Garza is correct that the phrase "move the money" does not describe in detail the financial transaction relied upon, we conclude that the indictment was nevertheless sufficient. The indictment tracks the statutory language for each of the elements of money laundering, which are that the defendant "(1) conducted or attempted to conduct a financial transaction, (2) which the defendant knew involved the proceeds of unlawful activity, (3) with the intent [either] to promote or further unlawful activity." *West*, 22 F.3d at 590. In addition to these statutory bare bones, the indictment was "accompanied

---

**20.** Moreover, the judge instructed the jury to disregard anything he did during the trial that

suggested he had an opinion about the case.

with such a statement of the facts and circumstances as ... informed the accused of the specific offense ... with which he [was] charged." *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2908, 41 L.Ed.2d 590 (1974). The indictment specified the date on which the event occurred, the exact dollar amount involved and the fact that the general type of transaction at issue was the movement of this money. *See* § 1956(c)(4)(A)(i). This description fairly informed Garza of the charge he would have to meet. It is also sufficient to bar future prosecutions for this same offense. We conclude that the district court did not err by refusing to dismiss Count 10.

Garza also suggests that the evidence was insufficient to prove that he conducted a financial transaction. The government can prove a financial transaction by establishing the transfer or delivery of money, § 1956(c)(3), which can include giving it "over to the care or possession of another." *United States v. Puig–Infante*, 19 F.3d 929, 938 (5th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 180, 130 L.Ed.2d 115 (1994). The trial evidence established that Garza received this money from Richard Bordayo in Michigan and delivered an Oldsmobile Toronado containing this money to Israel Flores to drive back to Texas. Garza emphasizes that Israel originally told Texas Department of Public Safety (DPS) troopers that he did not know of the money in the car and that Garza himself denied knowing of the money. However, Garza conveniently ignores both Israel's trial testimony that he knew he was transporting money for Garza and Trooper Jorge Castillo's testimony strongly suggesting that Garza was angry with Israel for losing the money to the police. The evidence was sufficient to establish a financial transaction.

2. Did the district court err by denying a motion to suppress?

Garza contends that the court erred by admitting the money seized from the Toronado driven by Israel Flores, Flores' statement to the Texas DPS troopers and Garza's own statements to Trooper Castillo. After a pretrial hearing, the district court denied the motion to suppress. Garza challenges this ruling and contends that this evidence should have been excluded.

Approximately two weeks before the stop, Trooper Castillo was contacted by a confidential informant (CI) with whom he had worked before. The CI told Castillo that she was friends with Garza and that Garza was involved in drug trafficking. A week later, the CI phoned Trooper Castillo again and told him that she had travelled to Michigan with Garza and that they had brought back money. The CI also stated that they planned to return to Lansing, Michigan to pick up more money. Several days later, Castillo heard from relatives of the CI that a black Oldsmobile Toronado loaded with money was being driven from Michigan by Flores. Trooper Castillo was given a specific license number and given the approximate time that the car would be on U.S. Highway 77 in Texas.

Castillo arranged for surveillance along Highway 77 and the Toronado was spotted by agents at about 7:00 pm on November 14, 1989. Officers followed the Toronado in unmarked cars until 8:20 pm, when they had a marked police car pull it over for speeding. Trooper Castillo candidly testified that "the reason the trooper stopped him besides the speeding is because I asked him to." The officer agreed. Flores drove the Toronado to a DPS outpost, where the search began at 8:30 pm. Within ten minutes of starting the search, officers discovered $274,540 in cash hidden behind the vents in the back interior panels of the car. At some point, Flores was issued a warning for speeding.

Trooper Castillo advised Flores of his Miranda rights and took his statement. Flores told Trooper Castillo that he was unaware of the money in the car and that he was going to deliver the car to Garza. In the meantime, officers had also confirmed that the car was registered to Garza. Trooper Castillo drove to Garza's home where he informed Garza that he was an officer with the DPS, told him of the seizure and gave Garza a Miranda warning. Castillo then questioned Garza about the money and Garza denied that it was his. Garza refused to make a

written statement and Castillo left, as Israel Flores arrived at Garza's house.

The district court found, inter alia, that Flores was in fact speeding at the time that he was pulled over, that Flores made a valid consent to the search, that Trooper Castillo gave proper Miranda warnings to Garza and Garza had made statements to Castillo freely and without coercion.

#### a. The stop

■ Garza first maintains that, because the Texas troopers stopped the Toronado on the pretext that it was speeding but for the actual purpose of investigating the CI's tip, the stop was illegal. This argument is foreclosed by *United States v. Roberson,* 6 F.3d 1088 (5th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1322, 127 L.Ed.2d 671 (1994) (relying on *United States v. Causey,* 834 F.2d 1179 (5th Cir.1987) (en banc)). Under *Roberson,* "while we do not applaud what appears to be a common practice of some law enforcement officers to use technical violations as a cover for exploring more serious violations, we may look no further than the court's finding that [the officer] had a legitimate basis for stopping the [vehicle]." 6 F.3d at 1092. Garza does not dispute that Flores was speeding, a factual finding which is supported by Trooper Castillo's uncontradicted testimony at the suppression hearing. As *Roberson* makes clear, this is the end of our inquiry.[21]

#### b. The search

Garza next maintains that the search of the Toronado was illegal because the troopers did not obtain a warrant. However, the district court found that Flores gave a valid, uncoerced consent to the search and concluded that the consensual search was constitutional under *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). Garza argues that the consent was not valid

because it was tainted by an illegally pretextual stop. Because we have concluded that the stop was not unlawful, we also conclude that the consent was not tainted.

■ On appeal, Garza asserts that the scope of the search exceeded Flores' consent.[22] Garza never presented this argument to the district court; we review for plain error. *Calverley.* We measure the scope of consent by asking " 'what would the typical reasonable person have understood by the exchange between the officer and the [consenter].' " *United States v. McSween,* 53 F.3d 684, 687 (5th Cir.1995) (quoting *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 1803–04, 114 L.Ed.2d 297 (1991)). Using this standard, we conclude that the district court did not plainly err.

Before the troopers asked for his consent to search, they told Flores that they believed contraband had been placed in the vehicle. Flores then signed a written consent that permitted the troopers to search the "vehicle" including the "containers and contents." Flores was present during the search and did not attempt to stop or restrict the search at any time. *McSween,* 53 F.3d at 688 (failure to object to breadth of search indicates that search was within scope of consent). Contrary to Garza's description of the search as a "dismantling" or "dissection" of the car, the record reveals that troopers merely unscrewed two screws and removed two vent covers from the interior panels. *Compare United States v. Ibarra,* 965 F.2d 1354 (5th Cir.1992) (evenly divided en banc court) (agents used sledgehammer to smash open securely boarded-up attic). Given these circumstances, we have no doubt that the district court did not plainly err by admitting this evidence as the product of a valid consent.[23]

---

**21.** Garza's reliance on *United States v. Smith,* 799 F.2d 704 (11th Cir.1986) is thus unavailing.

**22.** In passing, Garza also suggests that because the vehicle was moved from the side of the highway (the location named in Flores' written consent), the consent was no longer valid. As the evidence shows that Flores agreed to move

the car and, in fact, moved it himself, this argument is meritless.

**23.** Because we uphold the search on this ground, we do not address Garza's arguments that the troopers lacked probable cause to search the Toronado and that the circumstances did not justify the troopers' failure to obtain a warrant.

3. Garza's statements.

Garza first asserts that his statements were the fruits of an illegal search and seizure. This argument is, of course, precluded by our conclusions above.

Garza next complains that he did not waive his Miranda rights. We uphold the district court's findings of fact related to this issue unless they are clearly erroneous, but we make a de novo review of the ultimate conclusion of voluntariness. *United States v. Rojas–Martinez*, 968 F.2d 415, 418 (5th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 828, 121 L.Ed.2d 698 (1992). With these standards in mind, we conclude that Garza's statement was voluntary. Garza does not dispute the facts as we explained them above, but emphasizes that Trooper Castillo began asking questions immediately after he finished reading Garza his rights; that Garza was not given a written waiver form; that Garza was reluctant to answer some of Castillo's questions and refused to make a written statement. However, contrary to Garza's suggestion, his refusal to make a written statement after having already made verbal statements supports a conclusion that, had he wished to remain silent earlier, he would have done so. The fact that Trooper Castillo did not try to further question Garza after Garza declined to make a written statement also supports the court's finding that Garza was not coerced. In view of the circumstances, the district court did not err in deciding that Garza's statements were voluntary.

In sum, we conclude that the district court did not err by admitting the evidence obtained through the stop and search of the Toronado on November 14, 1989.

## E. OTHER ISSUES

1. Did the court err by admitting photographs of lost evidence?

Garza complains that the court should not have admitted a photograph of the interior of Gilberto Matos' car, which showed a set of keys and two pairs of gloves that the government lost before trial. This photo bolstered Israel Flores' testimony that he and Manuel Flores wore gloves when they murdered Matos and that they left the gloves in Matos' car. It also supported the investigating officer's testimony that they found gloves in the car at the crime scene. The district court admitted the photo as an accurate representation of what the investigator saw when he looked inside Matos' car.[24] The government properly authenticated the photo and the court did not err by admitting it. Fed.R.Evid. 901(a); *United States v. Mojica*, 746 F.2d 242, 245 (5th Cir.1984).

Garza next argues that, by losing the gloves and keys, the government violated its duty to preserve evidence that might have exculpated him. However, Garza does nothing more than state generally that the lost keys and gloves *might* have helped him and never even theorizes as to how they would have assisted him. Under Fifth Circuit precedent, such unfocused speculation is not enough and this argument must fail. *United States v. Binker*, 795 F.2d 1218, 1230 (5th Cir.1986), *cert. denied*, 479 U.S. 1085, 107 S.Ct. 1287, 94 L.Ed.2d 144 (1987) (evidence must possess exculpatory value that is apparent before its loss).

2. Did the district court commit pretrial error and allow government misconduct?

Garza raises a number of issues concerning the manner in which the district court managed discovery and scheduling. Garza first contends that the district court deprived him of his right to effective counsel by refusing to grant him an additional one month's continuance. Garza was indicted on January 5, 1993 and was given several continuances over the following months. On May 28, Garza filed a motion asking the court to continue his trial date thirty days after the already rescheduled June 30 trial date. The court instead gave Garza an additional week and jury selection commenced on July 6, 1993.

We will find that the district court abused its discretion in refusing a continuance only if Garza can show that he was seriously prejudiced by the denial. *United States v. Ross*, 58 F.3d 154, 159 (5th Cir.

**24.** Contrary to Garza's argument, the best evidence rule is not implicated in this ruling.

1995). When he moved for this continuance, Garza emphasized the vast amount of evidence that the government produced, the number of aggravating murders that the government alleged and that much of the documentary evidence of the Mexican murders was written in Spanish; on appeal he reiterates these same factors. However, even after this motion, Garza had over one month in which to prepare for trial. Garza makes no effort to explain what he was unable to accomplish in this time or what more he would have done had he been given the extra three weeks. In short, Garza has not shown that he was prejudiced. For this reason, we find that the court did not err in limiting its continuance to one week.

■■■ Garza next argues that the government purposefully inflated its witness list in order to prevent him from preparing for trial. Approximately one week before jury selection, the government gave Garza a list containing more than 400 names. Garza complained that the government could not honestly expect to call this number of witnesses and the court asked the government to provide a list of witnesses which the government would "call for certain." Four days before the government began presenting evidence, the government gave Garza a revised list of approximately 200 witnesses. At trial, the government called approximately 60–70 of these witnesses.[25]

We see no error in the manner in which the district court handled this issue. When Garza brought his objection to the court's attention, the court appropriately directed the government to submit a more limited list. The government readily complied and Garza did not renew his complaint after receiving the revised list. Garza has not shown that the court's remedy was insufficient to protect his rights or that it affected the outcome of

his trial. *United States v. Neal,* 27 F.3d 1035, 1049 (5th Cir.1994).

■■■ Garza also complains that the government did not provide him with the criminal records of Trooper Castillo's confidential informant who testified as part of the government's case, in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). However, the record shows that Garza discovered the witness' criminal record. He was able to impeach this witness on cross-examination with the information that she had been convicted of helping her husband steal a truck. Therefore, we find no *Brady* violation. *Lawrence v. Lensing,* 42 F.3d 255, 257 (5th Cir.1994) (when defendant is able to take advantage of essential information, no violation).

■■■ Additionally, Garza complains that the government gave him insufficient notice of the facts and information underlying the aggravating factors in general and of two of the alleged aggravating homicides in particular. However, Garza does not point to any failure of the government to comply with the district court's discovery orders and does not argue that the court erred by failing to order discovery of aggravating evidence. Garza has shown no error.

■■■ Next, Garza complains that the government did not specify which people on its witness list were confidential informants. There is no merit to this point, given that the record demonstrates that prior to trial, Garza's attorney informed the court that the defense knew who the confidential informant was.[26]

3. Did the court err by denying Garza's request for Jencks Act and *Brady* material?

Garza contends that the government withheld the statements of three witnesses to

---

**25.** Garza also states that the government did not include the witnesses' addresses on this list as required by 18 U.S.C. § 3432. However, because Garza did not raise this issue below or include the witness list in the record, we are unable to review this issue. *See United States v. Carrillo–Figueroa,* 34 F.3d 33, 39 (1st Cir.1994); *United States v. Vasquez,* 985 F.2d 491, 494–95 (10th Cir.1993).

**26.** Garza also complains that the government interfered with his attempts to interview a prosecution witness. However, while this witness was generally uncooperative, the record contains nothing to show that the government itself did anything to hinder his attempts to talk with her.

which he was entitled under the Jencks Act, 18 U.S.C. § 3500, and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). These witnesses were cooperating co-conspirators who had been debriefed by government agents prior to their plea negotiations. None of these witnesses had made formal statements, but government agents had taken notes during their interviews. Garza maintains that he is entitled to these notes.

### a. Jencks Act

 A Jencks Act statement is either (1) "a written statement signed or otherwise adopted or approved by the witness," or (2) "a 'substantially verbatim recital' of an oral statement made by the witness." *United States v. Thomas,* 12 F.3d 1350, 1364 (5th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 1861, 128 L.Ed.2d 483 (1994). When an agent takes notes while interviewing a witness, those notes are not statements "unless the witness 'signed, read, or heard the entire document read.'" *Id.* (quoting *United States v. Pierce,* 893 F.2d 669, 675 (5th Cir.1990), *cert. denied,* —— U.S. ——, 113 S.Ct. 621, 121 L.Ed.2d 554 (1992)). The record supports the district court's conclusion that the government had not obtained a "statement" from any of these witnesses.

### b. *Brady* material

 Garza also asserts that these notes should have been disclosed to him as *Brady* material. However, Garza never made a specific *Brady* request for these notes and, until his appeal, never suggested that these notes might contain *Brady* material. In these circumstances, the district court did not err in accepting the government's representation that it has furnished the defendant with all *Brady* materials. The district court was under no duty to make an independent sua sponte inquiry to determine whether these notes might contain exculpatory information. *See United States v. Gaston,* 608 F.2d 607, 614 (5th Cir.1979).

**4.** Did the court err by admitting a statement not disclosed in discovery?

 Garza contends that the district court erred by admitting a statement of his that the government had not disclosed during pretrial discovery. Because Garza was not entitled to this statement under the discovery rules, the court did not err in admitting the statement.

Garza made this statement after Trooper Castillo came to his house to ask him about the money that troopers had discovered in the Toronado driven by Israel Flores. Garza first denied that the money was his, then reconsidered and said that since he owned the car and the money was inside it, he figured the money should belong to him.[27] Just as the troopers were leaving the house, Israel Flores arrived. Garza flew off the handle and yelled at Flores in Spanish, "What happened, fool?", an inculpatory statement suggesting that Garza knew that the money was in the car all along.

Before trial, the district court ordered the government to produce any "statements" that Garza had made. The government disclosed everything that Garza had said to the troopers but did not reveal Garza's angry exclamation to Flores. When Trooper Castillo testified about this incident, the court overruled Garza's objection that the statement should have been produced during discovery.

Relying on *United States v. Alvarez,* 987 F.2d 77, 84–86 (1st Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 147, 126 L.Ed.2d 109 (1993), Garza contends that the district court erred by not suppressing this statement. However, the statement in *Alvarez* was covered under Fed.R.Crim.P. 16(a), which, among other things, requires the government to disclose those oral statements it plans to use at trial that the defendant made in response to interrogation by any person then known to the defendant to be a government agent.

Garza's statement is different because Garza did not make his statement to Trooper Castillo or any other government agent; he

---

**27.** This about-face apparently happened when Trooper Castillo told Garza, in effect, that since

the money was not his, he surely would not mind signing a form releasing the money to the state.

made it to Israel Flores in Trooper Castillo's presence. Not only was this not a statement made to a government agent, it was also not made in response to interrogation. *See United States v. Kusek,* 844 F.2d 942, 947 (2d Cir.), *cert. denied,* 488 U.S. 860, 109 S.Ct. 157, 102 L.Ed.2d 128 (1988) (voluntary outbursts not covered by rule). Thus, Rule 16(a) does not apply and the court did not abuse its discretion by admitting evidence of this statement.

5. Did the court err by allowing the government to object during Garza's closing argument?

█ Garza argues next that the government objected so often during his closing argument that he was "deprived of his procedural rights to rebut the government's accusations." The record does not support this argument. Garza was given 1.5 hours to close, which occupied 60 pages of transcript. During Garza's argument, the government objected eight times on the grounds that Garza mischaracterized either the law or the evidence. On most occasions, the court instructed the jury to disregard any statements of law made by the attorneys that were inconsistent with the court's charge or to consider the evidence as the jury remembered it. Our review shows that while these objections were not entirely fruitful, they were also not frivolous. As the record reveals, the district court did not err, plain or otherwise, by failing to curb the government's objections.

█ Garza complains in more detail that through one of these objections, the government commented on his failure to testify. This objection occurred during the following exchange:

ATTORNEY FOR GARZA: Now, Mr. Garza did not testify. And the reason he didn't testify, ladies and gentlemen, is because

that decision was mine. He doesn't have—

GOVT: Objection, Your Honor. That is a misstatement of the law. The individual—

COURT: The objection is overruled.

It is obvious to us that the government did not manifestly intend to comment on Garza's silence by this objection, when Garza's silence had already been raised by Garza's counsel. The government was objecting to what it perceived as Garza's implication that the decision not to testify is made solely by the defendant's attorney. Additionally, the jury would most naturally construe this objection as a comment on Garza's closing argument, rather than on his choice not to testify. Garza's contention that the government's brief objection highlighted his decision to remain silent after he undertook to raise the issue and explain his silence is meritless. *United States v. Mackay,* 33 F.3d 489, 495 (5th Cir.1994).

## F. THE PENALTY PHASE

█ The day after the jury's guilty verdict, the district court convened the penalty hearing. The jury made a binding recommendation of a death sentence for each of Garza's § 848(e) convictions after taking steps required by the statute.[28] First, as to each murder, the jury was asked to decide whether the government had established at least one of the four aggravating "intent" factors in § 848(n)(1).[29] § 848(j). For the De La Fuente murder, the jury found that Garza had intentionally killed De La Fuente, (n)(1)(A), and that Garza had intentionally engaged in conduct intending that De La Fuente be killed and/or that lethal force be employed against him, (n)(1)(C). For the Rumbo murder, the jury again found both (n)(1)(A) and (n)(1)(C) and for the Matos murder, the jury found only (n)(1)(C). If the jury had not unanimously found one of these

**28.** For an additional overview of the § 848 scheme, see *U.S. v. Chandler,* 996 F.2d 1073, 1082–83 (11th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2724, 129 L.Ed.2d 848 (1994).

**29.** Paraphrased, § 848(n)(1) requires the jury to decide whether the defendant intentionally:
A) killed the victim;

B) inflicted serious bodily injury causing death;
C) engaged in conduct intending that the victim be killed or that lethal force be employed against the victim, causing death; or
D) engaged in conduct creating a grave risk of death to an innocent person, and that person died.

factors to exist for a murder, it could not have recommended a death sentence for that murder. § 848(k).

Having found the requisite aggravating intent for all three killings, the jury then considered the second category of statutory aggravating factors derived from § 848(n)(2)–(12). In this step, the jury found that Garza had committed all three murders after substantial planning and premeditation, (n)(8), and that Garza procured De La Fuente and Matos' killing by payment of something of pecuniary value, (n)(6). Again, if the jury had not unanimously found at least one of these enumerated factors for any of these killings, it could not have recommended death for that particular murder. § 848(k).

Having found these second tier statutory aggravators to exist, the jury was directed to determine whether the government had proven any of its non-statutory aggravators. In response to this inquiry, the jury found that Garza was responsible for five additional killings, that he procured two of these killings by payment of something of pecuniary value, that four of these killings were committed after substantial planning and premeditation, that two of these killings were committed in furtherance of the CCE, and that Garza represented a continuing danger to the lives of others based upon his pattern of violent and brutal acts.

The jury next considered whether Garza had proven any mitigating factors. Garza's jury found that Garza had established the statutory mitigators that he was under unusual and substantial duress, that he was youthful, that other defendants who were equally culpable would not be punished by death and that the victims consented to the criminal conduct that resulted in their deaths. Although it did not specify which one, the jury also found at least one mitigator from the list of non-statutory mitigators that Garza had introduced.

After making these findings, the jury was instructed to balance the aggravators against the mitigators. The jury could recommend death only if it unanimously found that the aggravators sufficiently outweighed the mitigators to justify a sentence of death. Even if it found the aggravators sufficiently weighty,

the jury was never required to recommend death. After considering the questions required by the statute, Garza's jury recommended a death sentence. Pursuant to § 848(o), the jurors certified that they arrived at this decision without considering the race, color, religion, national origin or sex of Garza or his victims. After the jury recommended death, the district court imposed a death sentence as the statute mandated. § 848(l).

1. Did Garza have a right to have the jury informed that life imprisonment without parole was the only alternative to a death sentence?

a. *Simmons v. South Carolina*

 Garza contends that the jury should have been told that if they decided against a death sentence, his only alternative sentence would be life imprisonment without possibility of parole. Instead, Garza's jury was informed that life without parole was a possible sentence, but not the only other sentence that the court could impose. Garza relies on *Simmons v. South Carolina*, —— U.S. ——, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), which holds that when a defendant is legally ineligible for parole and the government uses the defendant's future dangerousness as an aggravator, due process requires that the jury be informed that if he is not executed, the defendant will spend the rest of his life in prison. Garza maintains his situation was analogous to *Simmons* because he was ineligible for anything less than a life sentence. For the following reasons, we disagree.

1) Alternative sentence

Under § 848(e), if the jury had not recommended a death sentence, the district court could have sentenced Garza to "any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment." The district court would then have been required to follow the Sentencing Guidelines to arrive at an appropriate sentence. Garza correctly points out that under the base offense level for § 848(e) murders, the available sentence is life imprisonment. *See* U.S.S.G. § 2A1.1 and Sentencing Table.

However, the Guidelines also allow a district court to depart from the assigned offense levels and impose a lesser sentence.

Garza acknowledges this point but contends that the Guidelines would not have permitted a departure in his case. Garza first argues that because the jury made the aggravating findings that he *intentionally* killed (or caused to be killed) Matos, De La Fuente and Rumbo, § 848(n)(1)(A) and (n)(1)(C) made Garza ineligible for departure under § 2A1.1. He relies on comment (n. 1) to § 2A1.1 which provides that a departure may be warranted if defendant did not cause death intentionally. However, assuming without deciding that the jury's findings of intentional killing would be binding on the sentencing judge and therefore prevent a downward departure, the court could not predict before the jury begins its deliberation whether it is going to find the necessary intent. Thus, when the attorneys make their final arguments in the penalty phase and when the court gives its penalty instructions, no one would know whether life imprisonment would be the only permissible sentence.

Garza also contends that he does not qualify for departure because none of the Guidelines' enumerated grounds for departure (substantial assistance, etc.) exist in his case. This contention is both incorrect and insufficient. Garza's jury found as a mitigator the fact that Garza was under unusual and substantial duress, which might qualify Garza for downward departure under § 5K2.12. Further, § 5K2.0 gives the district court broad discretion to depart for any "mitigating circumstance of a kind, or to a degree, not adequately taken into consideration" by the Guidelines. Thus, even if Garza did not fall within an express departure category, the court would not have been legally barred from finding a different, legitimate reason to reduce his sentence. In sum, because the Sentencing Guidelines vest the district court with discretion to adjust a life sentence downward, a life sentence was not the only legal sentence other than death that Garza might receive. In such circumstances, the district court did not err by preventing Garza from informing the jury to the contrary either in voir dire or in his closing argument,

or by failing to tell them so itself. *Allridge v. Scott,* 41 F.3d 213, 221–22 (5th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1959, 131 L.Ed.2d 851 (1995); *Kinnamon v. Scott,* 40 F.3d 731, 733 (5th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 660, 130 L.Ed.2d 595 (1994).

### 2) Reliance on future dangerousness

Garza further urges that, even if the government did not violate the express holding of *Simmons,* its emphasis on future dangerousness was inappropriate because it knew that anything less than a life sentence was unlikely. However, the record clearly shows that the government primarily focused on the danger Garza would pose *while still in prison,* making Garza's case materially different than *Simmons. Allridge,* 41 F.3d at 222 n. 12 (citing *Simmons,* —— U.S. at ——, 114 S.Ct. at 2194). The government did comment briefly on Garza's potential non-death sentence after Garza himself repeatedly urged the jury that life imprisonment would be sufficient punishment. In rebuttal, the government stated "The defense says, well, he is going to die in prison, but the law is twenty years to life. We don't know that he is going to die in prison. The Judge can give him any term. The only people who can give him the death penalty is you." While Garza places great weight on the reference to "any term", we are confident that, in the context of the entire penalty phase, the jury did not misunderstand the government's statement. Garza also complains that by having his cooperating co-conspirators testify about their reduced sentences, the government impressed the jury with the "revolving-door" nature of the penal system. But Garza himself repeatedly emphasized these witnesses' reduced sentences in order to attack their credibility; he cannot fairly claim now that such information contributed to a *Simmons* violation.

■ This does not mean that district courts should allow the government to freely hammer away on the theme that the defendant could some day get out of prison if that eventuality is legally possible but actually improbable. By this point in any penalty hearing, the judge will have heard the same

evidence as the jury and will ordinarily know whether he would consider a downward departure if the jury declines to recommend death. If the court knows that a twenty-year sentence is highly unlikely, it should, in its discretion, preclude the government from arguing that the defendant may be free to murder again two decades hence. But that is not what happened in Garza's case, and we see no error in the way the district court handled the issue.

b. Jury's power to recommend a specific non-death sentence.

Garza maintains that the jury should have been given accurate information about the non-death sentencing alternatives because under § 848(k), it was within the jury's power to recommend a sentence of life imprisonment.[30] First, we are satisfied, as indicated above, that the jury *was* given accurate information about the legally available non-death sentences.

■ Garza's contention also rests on a misinterpretation of § 848(k) and the jury's role in sentencing under that statute. According to Garza, the legislative history of § 848 requires us to conclude that the jury has the power to recommend a specific non-death sentence that is binding on the court. However, we agree with the Eleventh Circuit's well-reasoned interpretation of the plain language of the statute and agree that § 848(k) is clear enough to be interpreted without resort to legislative history. *Chandler*, 996 F.2d at 1084–85. Section 848(k) must be read in harmony with the rest of the statute, particularly §§ 848(*l*) and 848(p), which respectively read:

> Upon the recommendation that the sentence of death be imposed, the court shall sentence the defendant to death. Otherwise the court shall impose a sentence, other than death, authorized by law;

> If a person is convicted for an offense under subsection (e) of this section and the court does not impose the penalty of death, the court may impose a sentence of life imprisonment without possibility of parole.

Therefore, we conclude that § 848(k) does not allow the jury to make a binding recommendation on any sentence other than that of death.

Garza attempts to distinguish *Chandler* because a *Simmons* issue was not present in that case. This difference has no bearing on whether *Chandler* properly construed § 848(k). Garza also asserts that we must accept his interpretation of § 848(k) because it avoids the constitutional problem in *Simmons*. But we need not construe a statute to avoid a problem we have determined does not exist. Additionally, since *Simmons* can be satisfied with an appropriate jury instruction in the appropriate case, *Simmons* need not inform our construction of § 848(k).

Lastly, Garza points out that the recently adopted Federal Death Penalty Act of 1994 gives the jury the power to recommend either a death sentence or a life sentence without parole. 18 U.S.C. § 3593(f). However, under the law in effect at the time of Garza's sentencing, the jury's only responsibility was to recommend for or against death and Garza advances no persuasive argument for applying the 1994 Act. Therefore, we conclude that § 848(k) did not require the jury to be informed that it could recommend a sentence other than death.

2. Are the § 848(n)(1) findings and factors unconstitutional?

a. The narrowing requirement

■ Garza argues that the § 848 sentencing scheme is unconstitutional because the (n)(1) aggravators do not narrow the class of defendants eligible for the death penalty. As we previously described, § 848(n)(1) requires that the jury find that the defendant either:

(A) intentionally killed the victim,

(B) intentionally inflicted serious bodily injury which resulted in the death of the victim,

(C) intentionally engaged in conduct intending that the victim be killed or that

---

**30.** In relevant part, § 848(k) reads:
[T]he jury ... shall recommend that a sentence of death shall be imposed rather than a sentence of life imprisonment or some other lesser sentence.

lethal force be employed against the victim, which resulted in the death of the victim, or

(D) intentionally engaged in conduct which:

(i) the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense; and

(ii) resulted in the death of the victim.

These factors act as both a gateway and as aggravators. If the jury does not find at least one of these factors, its consideration of a penalty of death must stop; once the jury finds an (n)(1) factor, it must later weigh that factor (along with other aggravators) against any mitigating factors. For the three murder convictions in Garza's case, the jury found a total of five (n)(1) factors.

Garza and the government agree that these factors are taken from *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) and *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). In these decisions, the Supreme Court described the minimal level of homicidal intent that the Eighth Amendment requires before a state may execute a defendant for murder. Taken together, *Enmund* and *Tison* stand for the rule that the state may not put to death a defendant who did not "himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed," *Enmund,* 458 U.S. at 797, 102 S.Ct. at 3376, or significantly participate in a felony with reckless indifference to human life, *Tison,* 481 U.S. at 158, 107 S.Ct. at 1688. While every state or federal capital punishment scheme must provide for a factfinder to decide whether the defendant is sufficiently culpable under *Enmund/Tison,* the § 848 procedure is the only scheme we have found which also uses the *Enmund/Tison* factors as aggravating circumstances.

Garza contends that the constitution does not permit an *Enmund /Tison* finding to be used as an aggravator because the *Enmund/Tison* culpability requirement must be met in every case in which the defendant can lawfully be executed. Thus, Garza argues, "a sentencer fairly could conclude that [it] applies to every defendant eligible for the death penalty [and it] is constitutionally infirm." *Arave v. Creech,* —— U.S. ——, ——, 113 S.Ct. 1534, 1542, 123 L.Ed.2d 188 (1993). Although this argument is appealing on its face, it ultimately must fail.[31]

The answer to this issue lies in determining what the *Creech* Court meant when it spoke of defendants who are "eligible" for the death penalty. In other words, to figure out whether an aggravator narrows, we must first understand what class or category of offenses or offenders it must narrow from. Garza's argument necessarily depends on the presumption that this class is defined in part by *Enmund/Tison.* But this is not the case.

Although *Lowenfield v. Phelps* dealt with a different issue, the Court's analysis there informs our decision here. Like § 848, the aggravating circumstance in *Lowenfield* was included both as an element of the crime and as an aggravator at sentencing. Lowenfield was convicted of three counts of first-degree (capital) murder, which was defined as "the killing of a human being ... (3) when the offender has a specific intent to kill or to inflict great bodily harm upon more than one person." 484 U.S. at 241–42, 108 S.Ct. at 553 (citing La.Rev.Stat.Ann. § 14:30 A). As the sole aggravator, the jury found that "the offender knowingly created a risk of death or great bodily harm to more than one person." *Id.* To determine whether this aggravator performed the required narrowing function, the *Lowenfield* Court looked to the larger class of all murders—even though this class

---

**31.** As Garza is zealous to point out, this is a different issue than other courts have confronted in upholding the (n)(1) factors. *Compare Chandler,* 996 F.2d at 1092–93; *United States v. Pitera,* 795 F.Supp. 546, 556–57 (E.D.N.Y.1992); *United States v. Pretlow,* 779 F.Supp. 758, 771–73 (D.N.J.1991); *United States v. Cooper,* 754 F.Supp. 617, 621–22 (N.D.Ill.1990), *aff'd.,* 19 F.3d 1154 (1994). In each of these cases, the defendant argued that the (n)(1) factor unconstitutionally duplicated an element of the offense. These courts correctly rejected this argument for the reasons given in *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). In contrast, Garza's argument does not hinge on the fact that *Enmund* culpability is both an aggravator and a statutory element; his argument would be the same even if intent was not part of capital murder under § 848(e).

included felony murders for which the death sentence could not necessarily be imposed under *Enmund/Tison.* 484 U.S. at 241 and 246, 108 S.Ct. at 553 and 555. Because the larger class included defendants to whom the aggravator did not apply, the Court concluded that the aggravator narrowed.[32]

■■■ Garza was convicted under § 848(e), which reads in part:

any person engaging in or working in furtherance of a continuing criminal enterprise ... who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual, and such killing results ... may be sentenced to death.

The (n)(1) factors roughly duplicate the statute's "intentionally kills" element, so in order to determine whether the (n)(1) factors narrow the class of defendants eligible for the death penalty, we (like the *Lowenfield* Court) contrast them to federally-defined murders generally. Under 18 U.S.C. § 1111:

Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, burglary, or robbery ... is murder in the first degree. Any other murder is murder in the second degree.

Section 1111 includes simple felony murder; to be guilty of first degree murder, the defendant need only have intended to commit the underlying felony. No other mens rea is required. *United States v. Thomas,* 34 F.3d 44, 48–49 (2d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 527, 130 L.Ed.2d 431 (1994); *United States v. Chischilly,* 30 F.3d 1144, 1159–60 (9th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 946, 130 L.Ed.2d 890 (1995). *See also United States v. Browner,* 889 F.2d 549, 552 n. 2 (5th Cir.1989) (aspects of traditional felony-murder rule survive in § 1111). Thus, § 1111 encompasses defendants that would not necessarily qualify for the death penalty under *Enmund* and *Tison.*

By selecting out only those defendants who were at least reckless of killing, the (n)(1) factors genuinely narrow the class of defendants who have committed murder. This is precisely what the constitution requires. *Tuilaepa v. California,* —— U.S. ——, 114 S.Ct. at 2634, 129 L.Ed.2d 750 ("[t]o render a defendant eligible for the death penalty in a homicide case ... the trier of fact must convict the defendant of murder and find one [aggravator] at either the guilt or penalty phase"); *Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983) (capital sentencing scheme must "genuinely narrow that class of persons eligible for the death penalty and must justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder"). That the federal definition of murder does not include the *Enmund/Tison* culpability requirement is not of constitutional concern. What *Lowenfield* suggests in operation, the Supreme Court has stated elsewhere directly: *Enmund* "does not affect the state's definition of any substantive offense, even a capital offense" and "does not supply a new element of the crime of capital murder that must be found by the jury." *Cabana v. Bullock,* 474 U.S. 376, 385 and n. 3, 106 S.Ct. 689, 696 and n. 3, 88 L.Ed.2d 704 (1986).[33]

32. Indeed, in *Creech* itself, the Court compared the disputed aggravator against a class that was defined without regard to *Enmund/Tison.* To determine whether the factor "cold-blooded, pitiless slayer" narrowed, the *Creech* Court contrasted it with the broad class of state-defined capital murders, which, again, encompassed certain kinds of simple felony murder. —— U.S. at ——, 113 S.Ct. at 1543.

33. For these reasons alone, we are satisfied that the (n)(1) factors perform the constitutionally required narrowing function. However, as Garza relies heavily on principles taken from

*Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), and *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), we stop to explain why these opinions do not alter our decision on this issue. In the first place, *Godfrey* and *Maynard* were primarily concerned with aggravators which were unconstitutional because they were vague. *See Godfrey,* 446 U.S. at 428, 100 S.Ct. at 1764–65 ("outrageously or wantonly vile, horrible or inhuman"); *Maynard,* 486 U.S. at 363–64, 108 S.Ct. at 1859 ("especially heinous, atrocious, or cruel"). However, the difference between those

If we were to agree with Garza's argument on this point we would also have to ignore the "settled principle" that "the sentencer should consider the circumstances of the crime in deciding whether to impose the death penalty." *Tuilaepa,* —— U.S. at ——, 114 S.Ct. at 2637. And lastly, we find significant the fact that we are dealing with a statute that includes an additional narrowing factor (killing *in furtherance of a CCE* ) and requires the jury to find not just *Enmund/Tison* culpability but at least one other narrowing aggravator. § 848(n)(2)–(12).

We conclude that the *Enmund/Tison* culpability factors only apply to a subclass of defendants that may be sentenced to death. For this reason, we hold that the (n)(1) aggravating factors narrow the class of defendants eligible for the death penalty and are constitutionally sound.

### b. Sufficiency of the evidence

Garza contends next that two of his death sentences are invalid because they are based on multiple (n)(1) factors. As we have already said, for the Rumbo and De La Fuente murders, the jury found that Garza intentionally killed the victims, (n)(1)(A), and also that he intentionally engaged in conduct intending that the victims be killed or that lethal force be employed against the victims, which resulted in the death of the victims, (n)(1)(C). Garza maintains both that these findings violate the prohibition on the use of redundant aggravators and as to the De La Fuente murder, the (n)(1)(A) aggravator is unsupported by the evidence.

In support of his first argument, Garza relies on numerous state court decisions vacating death sentences where the jury's verdict was predicated on multiple aggravators based on the same underlying evidence. For example, in *Randolph v. State,* 463 So.2d 186, 193 (Fla.1984), *cert. denied,* 473 U.S. 907, 105 S.Ct. 3533, 87 L.Ed.2d 656 (1985), the court held that it was error to find as separate aggravators the facts that the murder was (1) committed during the commission of a robbery and (2) committed for pecuniary gain. The court reasoned that these factors overlapped and really constituted only one aggravating circumstance. Garza argues that the multiple (n)(1) findings are invalid for the same reason.

We find these cases inapposite. In cases like *Randolph,* the aggravators simply described the same conduct or motive in two different ways (i.e., a defendant who robs is usually seeking pecuniary gain). However, intentionally killing and intentionally engaging in conduct intending that the victim be killed are not necessarily identical conduct. A defendant who personally murders a victim has a different mental state than one who pays others to kill. Similarly, a defendant who personally kills and hires others to assist him during the killing has more than one blameworthy intention. Although the ultimate goal is the same—the victim's death— the defendant's intentions as to how he will achieve that goal are not singular. It is not irrational for Congress to decide that a defendant with such dual intent should be treated as more deserving of death than a defendant with only one.

Garza also maintains that the evidence does not support the jury's (n)(1)(A) finding that he intentionally killed De La Fuente.[34] In brief, the evidence showed that on the night of the murder, Garza gave Jesus Flores and Israel Flores a handgun, drove them to De La Fuente's nightclub, where De La Fuente would be that night, and told them to kill De La Fuente when he left the club. Garza contends that because he did

---

aggravators on the one hand and the (n)(1) aggravators on the other is not simply that those terms were vague while the (n)(1) terms are not. The *Godfrey* and *Maynard* aggravators were simply descriptive—adjectives that a jury could impose on the facts of any murder. In contrast, the (n)(1) factors are objective facts that not every jury will find in every murder, even murders under § 848(e). *Cf. U.S. v. Villarreal,* 963 F.2d 725 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 353, 121 L.Ed.2d 267 (1992) (defendant

was guilty of § 848(e) capital murder because he aided and abetted the killer, but jury found no (n)(1) factor). While all murders may be heinous, not all murderers intend to kill.

**34.** Under § 848(q)(3)(B), we affirm Garza's sentence if we determine that "the information supports the special finding of the existence of every aggravating factor upon which the sentence was based...."

not perform the act that immediately resulted in De La Fuente's death, the jury erred by finding that he "intentionally killed the victim." However, under the particular facts of this killing, we find that the jury could legitimately find that Garza intentionally killed De La Fuente.

Although the term "killed" is not defined in § 848, we have no doubt that Congress did not intend to limit that term to one who kills alone without help or assistance. Thus, we are persuaded that "killed" includes one who actively participates with others in a killing. Although Garza was not present at the very moment of De La Fuente's death, the jury was entitled to conclude that he actively participated in it by furnishing the weapon, determining when, where and how the victim would be killed, bringing his hit men to the scene, and giving them explicit instructions. Garza both contracted for this killing and actively participated in it. For this reason, the jury was entitled to conclude that Garza had two roles in this murder—he helped to kill the victim and he engaged in "conduct intending that the victim be killed." We conclude that the evidence supports both the (n)(1)(A) and (n)(1)(C) findings for the De La Fuente killing.

3. Is the § 848(n)(8) "substantial planning" aggravator unconstitutionally vague?

■ Under § 848(n)(8), the government may prove as an aggravating factor that "[t]he defendant committed the offense after substantial planning and premeditation." Garza maintains that this factor is invalid because it is unconstitutionally vague. At sentencing, the government sought to prove and the jury found that the (n)(8) aggravator existed for all three of the substantive murder convictions and four of the aggravating murders.

Garza argues that the (n)(8) aggravator is unconstitutionally vague and that the district court's instructions failed to cure this defect. Before trial, Garza made the unsuccessful objection that the (n)(8) factor was vague and facially unconstitutional. The government now argues that Garza never requested the district court to further define "substantial planning" and urges us to apply the plain error standard to the jury instructions. Our review of the record reveals that the district court was fully aware of Garza's objection to this factor and told Garza that he had preserved his objection in full. The plain error standard is therefore not appropriate in this circumstance.

■ An aggravating factor must "channel the sentencer's discretion by [a] clear and objective standard[ ] that provide[s] specific and detailed guidance," *Creech,* —— U.S. at ——, 113 S.Ct. at 1540, and adequately "inform juries what they must find to impose the death penalty," *Maynard,* 486 U.S. at 361–62, 108 S.Ct. at 1858. As the Supreme Court has recently explained, "Because the 'proper degree of definition' of [aggravating and mitigating] factors often 'is not susceptible of mathematical precision,' our vagueness review is quite deferential." *Tuilaepa,* —— U.S. at ——, 114 S.Ct. at 2634 (quoting *Walton,* 497 U.S. at 655, 110 S.Ct. at 3058). We will uphold an aggravating factor "if it has some 'common-sense core meaning . . . that criminal juries should be capable of understanding.'" *Id.* (quoting *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) (White, J., concurring in judgment)).

Garza maintains that the term "substantial" is vague because it is subjective and has different meanings: it can be used to refer either to something of high magnitude or to something that is not imagined or fanciful. However, we agree with the Northern District of Illinois, which upheld the (n)(8) aggravator against exactly this challenge and concluded that "the 'substantiality' requirement is frequently encountered and readily understood in a number of contexts in criminal law." *Cooper,* 754 F.Supp. at 623. *See, e.g., United States v. Sutton,* 961 F.2d 476, 478 (4th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 171, 121 L.Ed.2d 118 (1992) ("substantial step" not vague); *United States v. Rovetuso,* 768 F.2d 809, 821 (7th Cir.1985), *cert. denied,* 474 U.S. 1076, 106 S.Ct. 838, 88 L.Ed.2d 809 (1986) (same); *United States v. Johnson,* 575 F.2d 1347, 1357 (5th Cir.1978), *cert. denied,* 440 U.S. 907, 99 S.Ct. 1213, 59 L.Ed.2d 454 (1979) ("substantial income" not vague). In each of these cases, the term

"substantial" was used to denote a thing of high magnitude and each of these courts concluded that the term alone, without further explanation, was sufficient to convey that meaning and to enable the jury to make an objective assessment. *Cf. Blystone v. Pennsylvania,* 494 U.S. 299, 307–09, 110 S.Ct. 1078, 1084, 108 L.Ed.2d 255 (1990) (upholding against a different challenge "substantial impairment" as a mitigator).[35]

Garza argues that *Maynard* supports his position because it holds that the term "especially" failed to guide the sentencer's discretion. However, we agree with the government that the *Maynard* Court condemned the phrase "especially heinous" not because "especially" is vague but because "heinous" was, and adding "especially" did not cure that problem. 486 U.S. at 364, 108 S.Ct. at 1859.

In sum, we conclude that the (n)(8) aggravator is sufficiently definite and objective to pass constitutional muster. The district court did not err by submitting this factor to the jury or by failing to further define the term "substantial."

4. Did the penalty instructions misstate the law?

■■■■ Garza next challenges the verdict form and several penalty phase instructions.[36] Before we consider each alleged error individually, we pause to express the general standards that will guide our analysis. A district court has substantial latitude in framing its instructions to the jury. *United States v. McKinney,* 53 F.3d 664, 676 (5th Cir.1995); *United States v. Willis,* 38 F.3d 170, 179 (5th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2585, 132 L.Ed.2d 834 (1995). When reviewing challenges to jury instructions, we take into account the court's charge as a whole and the surrounding context of the trial, including arguments made to the

jury. *Id.; McKinney,* 53 F.3d at 676. Assuming that the defendant raised the error below, we will reverse only if the instructions do not correctly reflect the legal issues. *Id.* Thus, even if a portion of the instruction is not technically perfect, we will affirm if the charge in its entirety presents the jury with a reasonably accurate picture of the law. *United States v. Branch,* 46 F.3d 440, 442 n. 2 (5th Cir.1995). If the defendant did not object below, however, we review for plain error. *Willis,* 38 F.3d at 179.

a. The unanimity requirement

■■■■ Garza first argues that the verdict form created a substantial possibility that the jury believed that any decision rejecting the death penalty had to be unanimous. Specifically, Garza objects to the portion of the form which read:

> We, the Jury, unanimously find that the aggravating factors presented in this case sufficiently outweigh any mitigating factor or factors that have been found to exist, or in the absence of mitigating factors, the aggravating factors are themselves sufficient, and recommend that a sentence of death shall be imposed.
>
> Answer "Yes" or "No".
>
> ANSWER: _____

The form then included a line for each juror to sign.

Garza complains that the word "unanimously" should not have been included in this instruction. Garza posits that the question led the jury to believe that they could not answer "No" unless they unanimously did not recommend a death sentence. In other words, Garza argues that the jury could have understood this form to mean that all twelve jurors had to agree not to impose the death penalty, an understanding that is

---

**35.** *Victor v. Nebraska,* —— U.S. ——, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994), and *Arnold v. State,* 236 Ga. 534, 541–42, 224 S.E.2d 386 (1976), relied on by Garza, do not support a contrary conclusion.

**36.** In one gargantuan footnote, Garza asserts a laundry list of faults in the verdict form, most of which were not briefed elsewhere. Other than

citing the Fifth, Sixth and Eighth Amendments to the U.S. Constitution, Garza provides nothing to support his bald claim that because of these characteristics, the verdict form as a whole deprived Garza of due process of law. These issues are not adequately briefed to merit consideration. *McKethan,* 996 F.2d at 739 n. 9. *See also* Fed.R.App.P. 28(a)(6).

obviously inconsistent with § 848(k).[37] Garza also complains that the form did not contain a statement informing the jury that they were never required to recommend death.

If Garza's interpretation is one that "a reasonable jury could have drawn from the instructions given by the trial judge and from the verdict form employed in this case," we would find that the district court erred. *Mills v. Maryland,* 486 U.S. 367, 375–76, 108 S.Ct. 1860, 1866, 100 L.Ed.2d 384 (1988). And if this form was the only guidance the jury received on this point, reversal might be required. However, when we consider the verdict form as supplemented by the court's charge, we have no doubt that the jury did not interpret the verdict form in this fashion.

At the very outset of the punishment phase, the court twice told the jury that "the jury does not ever have to make [a death penalty] recommendation." Later during its introductory remarks, the court informed the jury that it did not unanimously have to agree on the mitigating factors, that "[o]ne of you is all that is required." The court stated that while all twelve jurors had to agree to recommend death, "[i]f any one of you … do not recommend death" then the court would perform the sentencing.

At the close of the punishment phase evidence, the court again repeatedly told the jury that "[a]ll twelve of you do not have to agree as to a mitigating factor. Only one of you has to be persuaded …" The court stressed several times that "under no circumstances do you ever have to recommend death. Under no circumstances. In order for death to be recommended, all twelve of you must agree." The court also stated that "any member who finds by a preponderance of the evidence the existence of a mitigating factor may consider such factor established for his or her weighing of aggravating and mitigating factors regardless of the number of other jurors who agree that such mitigating factor has been established." During his closing argument, Garza's attorney likewise emphasized that the jury was never required to impose a death sentence and that if only one juror disagreed, the jury could not recommend death.

Our review of the record leaves us firmly convinced that no reasonable juror would interpret the verdict form to require that the decision not to recommend death must be unanimous or that the jury was somehow required to impose death. Thus, the court did not abuse its discretion by tendering this verdict form to the jury.

b. Reinstruction on Garza's failure to testify

■■■ Garza contends that the district court erred by failing to tell the jury that they were to draw no unfavorable inference from Garza's failure to testify at the sentencing hearing. *Carter v. Kentucky,* 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981). Garza requested such an instruction at the guilt phase and the district court gave it. Garza never asked the court to give such an instruction at the sentencing phase and did not object to the court's proposed punishment instructions even though they did not include this charge. Accordingly, we review for plain error. *United States v. Gibson,* 55 F.3d 173, 180 (5th Cir.1995).

We conclude that the district court did not plainly err by not spontaneously giving an-

---

37. Garza's interpretation of the verdict form gains support from the district court's own actions during the conference. At one point, the court stated:

> We will modify it to reflect, "We, the jury, having found"—well, We, the jury, find that the aggravating factors sufficiently outweigh any—
> Well, it is not unanimous because "No" doesn't require. I don't want unanimously in there.
>
> \* \* \* \* \* \*
>
> I will tell them that. I am saying, I don't want to—"No" doesn't require unanimous.

This statement was directed in part to the court clerk, who later asked the court to clarify how it wanted the form to read. From the record, it appears that the court wanted the term "unanimously" deleted but the clerk accidentally left it in the form that was eventually given to the jury.

other *Carter* instruction at Garza's punishment hearing. As the *Carter* Court itself clarified, "a criminal trial judge must give a 'no-adverse-inference' jury instruction *when requested by a defendant to do so.*" 450 U.S. at 300, 101 S.Ct. at 1119. Garza attempts to persuade us that the rights safeguarded by *Carter* are sufficiently important that the failure to give such an instruction can never be harmless. This is clearly not the case. *United States v. Gomez–Olivas,* 897 F.2d 500, 501–02 (10th Cir.1990) (because court is only required to give "no-adverse-inference" instruction when requested, failure to give unrequested instruction that defendant could not be compelled to testify was also not error).

Garza has not shown that, in his own case, the lack of a *Carter* instruction affected his substantial rights. In spite of Garza's silence, the jury found several mitigating factors on his behalf and declined to find several of the aggravating factors that the government had attempted to prove. Both these facts strongly imply that the jury evaluated the evidence fairly and objectively without the instruction and did not make its findings on the basis of an unfair prejudice. The record also reveals that no party made reference to Garza's failure to testify at his penalty hearing. Moreover, we note that the punishment phase evidence against Garza was overwhelming and egregious and included five aggravating murders. In these circumstances, the fact that the jury was not given a second *Carter* instruction did not amount to plain error.

c. Standard of proof

■ Lastly, Garza maintains that the district court erred by instructing the jury that the aggravators had to "sufficiently outweigh" the mitigators in order for the jury to recommend death, instead of instructing them that the aggravators had to outweigh the mitigators beyond a reasonable doubt. Again, Garza did not object to this portion of the verdict form or the charge. Garza's failure to object is particularly noteworthy considering that during verdict form conference,

the court expressly deleted the reasonable doubt standard and substituted the "sufficiently outweigh" standard, asked for objections and received none. Thus, the plain error standard applies.

Under any standard, however, the district court committed no error. The court took the "sufficiently outweigh" language directly from § 848(k). Although Garza fervently argues that the reasonable doubt standard is most appropriate in cases where the defendant's life is on the line, he provides no authority that establishes that the Constitution requires this standard. Indeed, the Supreme Court has "never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required." *Franklin v. Lynaugh,* 487 U.S. 164, 179, 108 S.Ct. 2320, 2330, 101 L.Ed.2d 155 (1988) (plurality); *Zant v. Stephens,* 462 U.S. 862, 875–876 n. 13, 103 S.Ct. 2733, 2742 n. 13, 77 L.Ed.2d 235 (1983); *Sonnier v. Maggio,* 720 F.2d 401, 408 (5th Cir.1983), *cert. denied,* 465 U.S. 1051, 104 S.Ct. 1331, 79 L.Ed.2d 726 (1984). Thus, we conclude that the court's penalty instruction based on the language of § 848(k) is constitutionally valid. *Accord Chandler,* 996 F.2d at 1091–92.[38]

### III. MANUEL FLORES

As we stated earlier, Manuel Flores was convicted of murdering Gilberto Matos and Erasmo De La Fuente in furtherance of Garza's CCE and of conspiring to import and possess over 1,000 kilograms of marijuana. Flores raises two evidentiary issues.

### A. FLORES' CONFESSION

■ Flores first argues that the district court erred by admitting his oral confession. While Flores was incarcerated for a previous conviction, he was twice visited by United States Customs Service Agent Mark Reich. During Agent Reich's first visit, Flores denied that he had anything to do with murdering Matos or De La Fuente. When Agent Reich called on him a second time, however, he confessed to both murders. Before trial,

---

**38.** Garza lastly contends that the district court erred by admitting hearsay, in the form of a

newspaper article, during the punishment hearing. This argument is meritless. § 848(j).

Flores moved to suppress his confession, arguing that he had not been properly informed of his Miranda rights and that the confession was unreliable because it was not tape recorded or witnessed by anyone other than Agent Reich. After a hearing, the district court found that Agent Reich had given Flores oral Miranda warnings and denied the motion to suppress.

Flores now argues that under Fed.R.Evid. 403, the district court should have excluded his confession because it was so unreliable that its probative value was outweighed by the danger of unfair prejudice. Flores is not arguing that his confession is unreliable because it was coerced; nor does he contest the district court's factual findings that he received adequate Miranda warnings and was not threatened or intimidated. Indeed, Flores produced no evidence suggesting that Agent Reich's testimony is inaccurate. Instead, Flores essentially argues that without a written waiver, a recording, or more than one witness, an out-of-court confession should be excluded because it is unreliable as a matter of law.

■ When the evidentiary value of an out-of-court confession depends on the credibility of the officer who repeats it, the court correctly allows the jury to make this call. *United States v. Rico*, 51 F.3d 495, 507 n. 33 (5th Cir.1995). Flores has not provided any reason why the district court should have excluded Flores' confession as either unreliable or unfairly prejudicial. The district court did not err in admitting Flores' oral confession.

In two conclusory sentences, Flores also asserts that his conviction was based solely on an un-corroborated oral confession. Flores has failed to sufficiently brief this argument and we consider it waived. *McKethan*, 996 F.2d at 739 n. 9. Additionally, our review of the record shows that Flores' confession was corroborated by other evidence, including the co-conspirator statements that are the subject of his next argument.

### B. CO–CONSPIRATOR STATEMENTS

■ Flores argues that the district court erred by permitting Baldomero Medina–Garza (Medina), Rolando Vasquez, Jorge Vela–Garcia and Gregory Strader to testify to out-of-court statements made by other conspirators about the murders of De La Fuente and Matos. The court allowed their testimony over Flores' hearsay objections. On appeal, Flores maintains that these statements were not admissible under Fed. R.Evid. 801(d)(2)(E) because they were not made in furtherance of the conspiracy, but instead were idle chatter and bragging. We review the district court's decision to admit this testimony for abuse of discretion. *United States v. McConnell*, 988 F.2d 530, 533 (5th Cir.1993).

■ Flores first maintains that Medina should not have been allowed to testify that Juan Garza had told him that Garza arranged for Matos and De La Fuente to be killed. Flores argues that because Medina believed that Garza made this statement out of overweening pride, the statement was simple boasting and not in furtherance of the conspiracy. However, the district court was entitled to conclude that Garza made these statements in order to encourage loyalty and obedience among the conspirators, a purpose clearly in furtherance of the conspiracy.

■ Flores next asserts that Vela–Garcia should not have been allowed to testify that Jesus Flores told him that Jesus and Manuel Flores had killed De La Fuente and that Garza had paid Jesus for the job. However, this statement is also in furtherance of the conspiracy; not only did it inform Vela–Garcia of the progress of the conspiracy, it provided a money incentive for Vela–Garcia to assist the conspiracy in future murders. *See United States v. Pool*, 660 F.2d 547, 562 (5th Cir.1981) (statement keeping others abreast of conspiracy's status is in furtherance); *United States v. Simmons*, 923 F.2d 934, 945 (2d Cir.1991), *cert. denied*, 500 U.S. 919, 111 S.Ct. 2018, 114 L.Ed.2d 104 (1992) (statements inducing assistance are in furtherance). Flores does not tell us what other specific statements he believes should have been excluded, but our review of the entire record shows that all of the admitted conspirator statements furthered the conspiracy in similar ways. We conclude that the district

court did not abuse its discretion by allowing this testimony.

### IV. CONCLUSION

For the reasons stated above, the convictions and sentences of Garza and Flores are AFFIRMED.