**UNITED STATES of America**

**v.**

**Dean Anthony BECKFORD, Claude Gerald Dennis, Leonel Romeo Cazaco, and Richard Anthony Thomas.**

**Criminal Action Nos. 3:96cr66–01, 3:96cr66–05, 3:96cr66–06, 3:96cr66–07.**

United States District Court, E.D. Virginia, Richmond Division.

June 6, 1997.

David Novak, Stephen Miller, Andrew McBride, Assistant U.S. Attorneys, Office of the United States Attorney, Richmond VA, for Government.

Gerald T. Zerkin, Robert J. Wagner, Richmond, VA, for Mr. Beckford.

John C. Jones, Quinton, VA, Scott Brettschneider, Kew Gardens, NY, for Mr. Dennis.

Reginald M. Barley, Richmond, VA, Cary B. Bowen, Bowen & Bowen, Richmond, VA, for Mr. Cazaco.

David P. Baugh, Richmond, VA, Elizabeth D. Scher, Morchower, Luxton & Whaley, Richmond, VA, for Mr. Thomas.

## MEMORANDUM OPINION

PAYNE, District Judge.

The defendants moved to quash the Government's notice of intent to seek a sentence of death because it contained duplicative and cumulative statutory aggravating factors, 21 U.S.C. § 848(n)(1)(A) through (n)(1)(D).[1] At oral argument, the defendants conceded that this motion is moot. because all parties agreed that more than one such factor may be included in the *notice* because the process of winnowing the (n)(1) factors appropriately occurs at the conclusion of the evidence presented at the penalty phase, if one proves necessary. For that reason, and for the reasons set forth on the record, April 10, 1997, the defendants' motion is denied as moot.

Notwithstanding this turn of events, it remains necessary to address the Government's contention that the jury constitutionally may find the existence of more than one (n)(1) factor, so long as the factors are supported by more than one act. For the reasons which follow, the Court rejects the Government's position.

## STATEMENT OF FACTS

Before considering the legal issues raised by these motions, it is helpful to explain the context in which they have arisen. The following summary is based on the allegations of the Superseding Indictment and on evidentiary proffers made from time to time during other pre-trial motions.

### A. The Ambrose and Miller Murders

The capital charges against Dean Beckford and Claude Dennis arise out of their alleged participation in the murders of Sherman Am-

---

1. This motion was filed by Dean Beckford ("Beckford"). Richard Thomas ("Thomas"), Leonel Cazaco ("Cazaco"), and Claude Dennis ("Dennis") moved to adopt the motion. The motions of those defendants to adopt: Beckford's motion is granted.

brose and Dasmond Miller, and the shooting of Delroy Smith. *See* Superseding Indictment, Counts 5–6. According to the Superseding Indictment, beginning in July of 1988, Dean Beckford, who later became the leader of the Poison Clan, took "workers" from Brooklyn, New York, to assist him in the distribution of "crack" cocaine in Richmond, Virginia. Superseding Indictment, Count 3, Overt Act 5. Ambrose, Miller and Smith were some of the so-called "workers" who came to Richmond with Dean Beckford. *Id.* Sometime between their arrival in Richmond in July 1988 and December 4, 1988, it is asserted that Ambrose, Miller and Smith fell into disfavor with Dean Beckford. It is further alleged that, on December 4, 1988, Dean Beckford and Claude Dennis [2] intentionally shot Ambrose and Miller to death and critically wounded Smith.

The events leading to the murders of Ambrose and Miller began on the night of December 3, 1988, when Dean Beckford, Dennis, and Oliver Wiltshire [3] entered the apartment at 1514 Tifton Court in Richmond, Virginia where Ambrose and Miller resided.[4] At the time of the defendants' entry, the apartment was empty, but the three awaited the arrival of Ambrose and Miller. Ambrose and Miller returned to 1514 Tifton Court at approximately 11:30 p.m., encountering Dean Beckford and Dennis therein. Smith arrived at the apartment minutes thereafter.

When Smith entered the apartment, Dean Beckford and Miller were arguing over a silver .32 caliber Derringer gun. Smith observed Dean Beckford holding the gun, and described the argument as follows: "The nature of this argument was why Dasmond Miller brought this gun into the apartment. And Dasmond Miller said it's my gun, and I bought it with my license, and this is my apartment." *Commonwealth v. Dennis,* Criminal No. 89–221–F and 89–222–F (Trial Transcript, June 13, 1989).[5] After that, there was a "scuffling" between Dean Beckford and Miller, whereupon Smith "tried to break it up" until Dennis allegedly "pulled a gun out and put it to [Smith's] head and said, don't try." *Id.* At that point, Smith sat down and watched the remainder of the scuffle.

Eventually, Dean Beckford pushed Miller into the living room of the apartment. Miller, who was not aware that Dennis had a concealed firearm, turned his back to Dean Beckford, removed his jacket, and formally challenged Dean Beckford to a fight. With Miller's back turned, Dean Beckford nodded his head toward Dennis, "like give him a *nodding of the head, and do what I told you.*" *Id.* at 22. Dennis then pulled out his gun and fired a shot at Miller, which sailed "a couple of inches over [Miller's] head." *Id.* at 23. When Miller realized that he was being fired upon, he turned around, only to be shot in the heart and killed by Dennis' next bullet.

Smith, upon seeing Miller (his cousin) shot, jumped to Miller's aid to prevent him from falling. Dennis then fired a shot at Smith, which struck Smith "next to the heart, and the bullet came through in the center of [his] back." *Id.* at 23. Smith survived this bullet to the chest but played dead to avoid further attention. According to a police officer's report, Smith next related that, at that point, "Sherman Ambrose attacked Claude Dennis." And, although Smith did not actually witness the shooting, he heard a shot, and later found Ambrose lying in the kitchen with a bullet wound. According to Smith, he subsequently learned from the dying Ambrose

**2.** Dennis was previously tried for the Ambrose and Miller murders in Virginia state court in 1990; he was ultimately acquitted of the charges. *See Commonwealth v. Dennis,* Criminal No. 89–221–F and 89–222–F (Va.1989).

**3.** Wiltshire, who is Beckford's brother-in-law, is also indicted as a non-capital defendant in this case.

**4.** The facts set forth in this section are based, in part, on the account of events provided by Delroy Smith, an expected Government witness in this case, to Detective C.T. Woody on December 8, 1990, and in his testimony for the State at Dennis' state court murder trial. The parties have indicated that the version of events related by Smith may be disputed at trial. At present, however, Smith's account constitutes the record before the Court because the parties have cited the transcript of Smith's trial testimony in their briefs.

**5.** Wiltshire, although in the apartment, was allegedly upstairs during this entire incident.

that Dean Beckford had shot Ambrose with Miller's .32 Derringer.

## B. The "Sugar Bottom" Murders

The capital charges against Leonel Cazaco and Richard Thomas stem from their alleged involvement in the so-called "Sugar Bottom" Murders, which resulted in the deaths of Anthony Baylor, Marco Baylor and Anthony Merrit, as well as the critical wounding of Charles Meekins on January 12, 1994 at 20 North 31st Street, Richmond, Virginia. *See* Superseding Indictment, Counts 10–12. The events leading up to these killings began in December, 1993, when Devon Dale Beckford,[6] Dean Beckford's brother and co-leader of the Poison Clan, allegedly asked Anthony Baylor, a member of a rival drug organization, to sell "crack" cocaine for the "Poison Clan" from the location of 20 North 31st Street. Baylor refused. According to the Superseding Indictment, Devon Beckford was upset by Baylor's refusal, and, therefore instructed Cazaco and Thomas, and unindicted co-conspirators Peter Paul and Collin Joseph, to murder Anthony Baylor and any other persons inside the location of 20 North 31st Street, and to take any money or drugs found there at the time of the murder. Superseding Indictment, Count 3, Overt Act 43.

It is alleged that, on various occasions in January, 1994, Devon Beckford, Cazaco, Thomas, Paul and Joseph are said to have performed surveillance trips of 20 North 31st Street, in preparation for the murder. *Id.* at Count 3, Overt Act 46. And, on January 12, Devon Beckford purportedly gave Joseph a .41 Magnum caliber firearm which was then given to Thomas for use during the commissioned murders. *Id.* at Count 3, Overt Act 47. According to the Superseding Indictment, on that same date, Cazaco, Thomas, Paul and Joseph traveled to 20 North 31st Street, where allegedly Cazaco and Thomas murdered Anthony Baylor, Marco Baylor and Anthony Merrit, and critically wounded Charles Meekins.

**6.** Devon Beckford, who is named in the Superseding Indictment as a defendant in this case,

## DISCUSSION

With that factual background in mind, it is appropriate to consider the legal issues raised by the Government's assertion that the jury should be permitted to find the existence of more than one (n)(1) factor so long as each factor found is based on a separate act.

## A. Background

Section 848(n) of Title 28, United States Code, provides:

If the defendant is found guilty of or pleads guilty to an offense under subsection (e) of this section, the following aggravating factors are the only aggravating factors that shall be considered, unless notice of additional aggravating factors is provided under subsection (h)(1)(B) of this section—

(1) The defendant—

(A) intentionally killed the victim;

(B) intentionally inflicted serious bodily injury which resulted in the death of the victim;

(C) intentionally engaged in conduct intending that the victim be killed or that lethal force be employed against the victim, which resulted in the death of the victim;

(D) intentionally engaged in conduct which—

(i) the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense; and

(ii) resulted in the death of the victim.

21 U.S.C. § 848(n)(1). In its notice of intent to seek a sentence of death, the Government stated that it would seek to prove all four of these aggravating factors, (n)(1)(A)–(D), as the basis for imposing the death penalty. The defendants correctly responded to the Government's notice by claiming that the Section 848(n)(1)(A) through (D) circumstances, although not identical, may be duplicative because subsection (n)(1)(A), if established, necessarily subsumes subsections

remains a fugitive at large.

(n)(1)(B) through (D). *United States v. Tipton*, 90 F.3d 861, 900 (4th Cir.1996), ("as the government points out, each of the . . . three (n)(1) circumstances, (B), (C), and (D) . . . is necessarily subsumed as [a] 'lesser included' aspect of the (A)—'intentionally killed'—circumstance"), *cert. denied,* —— U.S. ——, 117 S.Ct. 2414, 138 L.Ed.2d 179, 1997 WL 49323, 49310, 48968 (1997); *see also United States v. McCullah*, 76 F.3d 1087, 1111 (10th Cir.) ("While the factors are not identical per se, the (n)(1)(C) factor necessarily subsumes the (n)(1)(D) factor."), *reh'g denied,* 87 F.3d 1136 (1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1699, 137 L.Ed.2d 825 (1997).

■ However, as the defendants have now conceded, the appropriate procedure is not to quash the notice of intent to seek a sentence of death because the sifting and selecting of Section 848(n)(1) circumstances must occur at the conclusion of the evidence at the penalty phase, if any. Thus, the notice properly may reference, and the Government may try to prove, all of the (n)(1) factors. Notwithstanding the propriety of the Government's notice, it is necessary to determine what procedure to follow after that evidence has been presented. For the following reasons, the Court will submit to the jury only those (n)(1) circumstances which are supported by evidence and, by instruction, will permit the jury to find only *one* of those submitted.

This issue was addressed by the Fourth Circuit in *United States v. Tipton*, 90 F.3d 861. In *Tipton*, the Court of Appeals held that the district court, under Section 848(n)(1), erroneously had permitted the jury to find all four mental state circumstances and to weigh them in the balancing of aggravating and mitigating factors pursuant to 21 U.S.C. § 848(k). In so holding, the Court found that: "[t]o allow cumulative findings of these intended alternative circumstances, all of which do involve different forms of criminal intent, runs a clear risk of skewing the weighing process in favor of the death penalty and thereby causing it to be imposed arbitrarily, hence unconstitutionally." *Id.* at 899 (citations omitted).

Although *Tipton* did not determine whether, as a general rule, it is proper to submit for the jury's consideration "only those (n)(1) circumstances, (A) through (D), for which there [is] sufficient evidentiary support," [7] the Fourth Circuit suggested the correctness of that approach when it remarked that there existed an "obvious potential for prejudicial error if a jury were permitted to consider and find the (A) circumstance when the guilt-phase evidence sufficed only to convict a defendant as a marginal aider and abettor who did not participate directly in the killing." *Id.* at 900 n. 23. The Court of Appeals clearly held, however, that a proper instruction would "have directed that from among those circumstances, (A)–(D), submitted for consideration as alternatives, *only one should be found as the basis of the required (n)(1) aggravating factor." Id.* at 900 (emphasis added).

Hence, *Tipton* counsels that the jury may be permitted: (1) to consider only those aggravating factors for which there exists evidentiary support; and (2) to find *only one* of the (n)(1)(A)–(D) circumstances as the basis for the required (n)(1) aggravating factor.

**B. The Government's Request that the Jury be Permitted to Find More than One (n)(1) Circumstance if Supported by Separate Acts is Denied**

The Government contends that, notwithstanding *Tipton*, the jury may find as many mental state circumstances as are supported by the evidence so long as each arises out of a separate act. According to this theory, then, the jury may weigh multiple mental state circumstances in conducting the Section 848(k) balance of aggravating and mitigating factors. In support of this claim, the Government relies upon decisions of the Fifth and Tenth Circuits.

**1. The Approach of the Fifth and Tenth Circuits**

In *United States v. Flores*, 63 F.3d 1342, 1372 (5th Cir.), *reh'g denied,* 77 F.3d 481 (1995), *cert. denied,* —— U.S. ——, 117 S.Ct.

---

7. It was unnecessary for the Court of Appeals to decide this question in *Tipton* because evidentiary support existed for all four of the circumstances.

87, 136 L.Ed.2d 43 (1996), the Fifth Circuit upheld the validity of death sentences which were imposed, in part, on a jury's finding of multiple (n)(1) aggravating factors. In particular, the jury in *Flores* had found that the defendant intentionally killed the victims under subsection (n)(1)(A), and also intentionally engaged in conduct intending that the victims be killed or that lethal force be employed against the victims, which resulted in the death of the victims, under subsection (n)(1)(C).

The defendant urged the Fifth Circuit to follow the course of several state courts, which had vacated "death sentences where the jury's verdict was predicated on multiple aggravators based on the same underlying evidence." *Id.* at 1372. The Fifth Circuit found those state court decisions to be inapposite, reasoning that, in them, "the aggravators simply described the same conduct or motive in two different ways ..." *Id.* In contrast, the Court of Appeals concluded that the defendant in *Flores* had engaged in conduct which was not the same and had acted with a dual intent to accomplish the same goal by different acts. As the Fifth Circuit explained:

> *intentionally killing* and *intentionally engaging in conduct intending that the victim be killed* are *not necessarily identical* conduct. A defendant who personally kills and hires others to assist him during the killing has more than one blameworthy intention ... It is not irrational for Congress to decide that a defendant with such dual intent should be treated as more deserving of death than a defendant with only one.

*Id.* (emphasis added). Therefore, to take an example, the court concluded that, because the defendant had furnished the weapon, had determined when, where, and how the victim should be killed, and had brought his men to the scene, the jury could have found that the defendant both had contracted for and actively participated in the murder, even though the defendant had not actually been present at the time of the murder. For those reasons, the Fifth Circuit ruled that the jury could have found that the defendant played two roles, each of which supported a finding of the (n)(1)(A) factor and of the (n)(1)(C) factor.

In *United States v. McCullah*, 76 F.3d 1087 (10th Cir.1996), the Tenth Circuit held that the district court had erred in submitting duplicative and cumulative aggravating factors, including Section 848(n)(1)(C) and (n)(1)(D). The Court of Appeals explained that: "when the same aggravating factor is counted twice, the defendant is essentially condemned twice for the same culpable act, which is inherently unfair." *Id.* at 1111 (internal quotations omitted). Therefore, the court concluded that, because (n)(1)(C) necessarily subsumes (n)(1)(D), "the use of duplicative aggravating factors creates an unconstitutional skewing of the weighing process which necessitates a reweighing of the aggravating and mitigating factors," even if the factors are not identical. *Id.* at 1111–12.[8]

After *Flores*, 63 F.3d 1342, the Government petitioned for a rehearing of the *McCullah* case on the basis of the Fifth Circuit's reasoning. The Tenth Circuit denied the petition for rehearing, finding *Flores* factually distinguishable because:

> In *Flores*, the defendant attempted to have one of the victims killed on prior occasions before finally succeeding. These prior attempts supported the 'engaging in conduct intending that the victims be killed' aggravating factor, which was separate and distinct from the "intentional killing" factor which pertained to the actual murder. Similarly, the other victim was tracked down by the defendant and his henchmen and interrogated by one of the defendant's accomplices in the defendant's armed presence. Then the defendant ordered the victim away, but evidently changed his mind and decided to kill him, shooting him numerous times. The jury may have found that the tracking down and the armed interrogation by the accomplice supported the lethal conduct aggravating factor, separate from the actual shooting

---

8. The Tenth Circuit also found that it was erroneous for the district court to have submitted a duplicative non-statutory aggravating factor to the jury, which alleged that the defendant "committed the offenses as to which he is charged in the indictment."

which supported the intentional killing factor ... Simply put, the defendant in *Flores* engaged in separate acts which supported different aggravating factors.

\* \* \* \* \* \*

By contrast, the aggravating factors alleged in this case ... overlapped because they were predicated upon the same acts by McCullah—namely, that McCullah identified the victim and drove him to the ambush site.

*U.S. v. McCullah,* 87 F.3d 1136, 1137–38 (10th Cir.1996).

### 2. *Flores* is Unsupported by Section 848 and *Tipton*

Here, the Government argues that the jury could find that: (1) Beckford intentionally killed Sherman Ambrose under Section 848(n)(1)(A) by shooting him; and (2) Beckford intentionally engaged in conduct intending that the victim Sherman Ambrose be killed or that lethal force be employed against the victim, which resulted in the death of the victim under Section 848(n)(1)(C) by engaging Claude Dennis to assist him in the murder of Ambrose. These two mental states, according to the Government, are supported by two separate acts; and therefore, under *Flores,* may be counted as two aggravating factors.

The Court declines the invitation to follow *Flores,* because, as explained below, the reasoning of *Flores* is inconsistent with the purposes served by the mental state circumstances enumerated in Section 848(n)(1). That is especially made clear by comparing Section 848 to the procedures enacted pursuant to the Federal Death Penalty Act of 1994. Also, *Flores* is incompatible with the reasoning of *Tipton.*

### 3. The Purpose of the (n)(1) Factors is not Served by Permitting a Finding of More than One Intent

In addition to serving as aggravating factors, the (n)(1) mental state circumstances serve to channel juror discretion and to en-

sure that, in committing the alleged killing, the defendants acted with the constitutionally minimum level of intent to support a sentence of death. This view finds substantiation in *Tipton,* 90 F.3d at 897, in which the Fourth Circuit explained:

> The four (n)(1) circumstances do essentially replicate the required mental states for constitutional imposition of the death penalty, but in doing so they reflect four distinctly different levels of moral culpability, ranging downward from direct "intentional killing," (A) to intentionally engaging in conduct with known potential for causing death that did in fact cause it, (D) ... In requiring the jury at sentencing then to address and make findings respecting these different circumstances ... § 848(n)(1) provides precisely the constitutionally required, principled basis for further distinguishing between those murders thought deserving of death and those thought not to be.

*Id.*

Further confirmation of this view is found in the fact that, pursuant to Section 848(k), a sentence of death may not be imposed unless an (n)(1) circumstance is first found. This demonstrates Congressional concern that the (n)(1) mental state circumstances serve to assure that no defendant will be sentenced to death without the jury's finding the constitutionally minimum level of intent to support that sentence. Juxtaposing Section 848 with the newer death penalty procedures set forth in 18 U.S.C. § 3591, the Federal Death Penalty Act of 1994, also verifies this conclusion. Indeed, in contrast to Section 848, the mental state circumstances set forth in Section 3591(a)(2) (the substance of which are similar to the Section 848 circumstances) do not serve as statutory aggravating factors, but serve only as "gateway eligibility findings." *See United States v. Nguyen,* 928 F.Supp. 1525, 1538–41 (D.Kan.1996).[9]

■ Hence, in light of the purposes served by the (n)(1) factors, the relevant intent un-

---

9. Moreover, Section 3591(a)(2)(A) through (D) were drafted in the disjunctive, which clarifies Congress' intent that the jury should find only one of the mental state factors. Section 848, as noted by the Fourth Circuit, unfortunately contains no conjunctive or disjunctive to signal whether one or more intent factors may be found.

der Section 848(n)(1) is the intent at the time the defendant engaged in the conduct which resulted in the death of the victim. Once that intent has been found, the death penalty may constitutionally be imposed provided, of course, that the jury makes the other statutory required findings. The question, therefore, reduces to how broadly to define the act or series of acts for the purpose of assessing the defendant's intent.

Using the Government's theory about the Ambrose murder for illustration, the issue becomes whether the Government should prove Beckford's intent at the time he fired the fatal shot, or whether the Government should prove Beckford's overall intent during the course of the events which ultimately lead to the shooting of Ambrose, including Beckford's alleged recruitment of Dennis for assistance. In other words, should the jury consider the defendant's intent as ever-changing throughout the course of the crime, and make a finding of intent as to each of the defendant's discreet acts? Or, should the jury consider the defendant's intent in perspective of the crime as a whole, but make its determination in perspective of the act which caused or resulted in the death?

■ The Government has taken the former position, which the Court now rejects. In assessing the Government's theory, it is necessary to realize that the jury will not hear about the alleged firing of the bullet, which proved fatal to Ambrose, in a vacuum. That, of course, is because the crime which ultimately resulted in Ambrose's demise involved many events. Some of those events may prove relevant to establishing Beckford's intent. Others may prove relevant only to establishing the circumstances of the crime.

In effect, the Government has opted for a snapshot approach, isolating specific acts, which occurred during the course of the crime, and claiming that each of the acts supports a separate intent. Under that approach, the jury would consider Beckford's alleged request for assistance, as an act, entirely separate from Beckford's act of pulling the trigger when the fatal shot was fired. However, the Government fails to follow its theory through to its logical conclusion. As-

suming that the acts are discreet and severable, only one of them—the firing of the weapon—actually caused the death of the victim. Therefore, assessing the Government's theory in perspective of the purposes of (n)(1), the only intent relevant to finding whether Beckford possessed an intent which may be thought deserving of a death sentence, would be the defendant's intent at the time he fired the weapon. The Government, however, claims that, although the acts are separate, both intents may support a finding of separate (n)(1) circumstances. That argument proves too much for it would permit imposition of the death penalty upon finding of an intent to perform an act which did not, in and of itself, actually cause death.

■ When taken to its logical conclusion, the Government's theory is refuted by the text of Section 848(n)(1)(A)–(D) which defines for each instance, (A) through (D), the death eligible intent with reference to the act that caused or resulted in death. Moreover, the Government's theory ignores the fundamental purpose of the (n)(1)(A)–(D) circumstances, which is to "focus the jury's attention upon the different levels of moral culpability that these specific circumstances might reasonably be thought to represent, thereby channeling jury discretion in the weighing process." *Tipton,* 90 F.3d at 899.

■ Of course, Beckford's request for the assistance of Dennis may prove relevant to showing that Beckford "intentionally killed" or it may be relevant to some other statutory or non-statutory aggravating factor, such as that the defendant committed the offense after substantial planning. However, Beckford's act (if it happened as facts suggest so far) of requesting Dennis' assistance, by itself, did not cause the death of Ambrose, and therefore, cannot alone serve to support a finding that the defendant committed the murder with the intent necessary to support a sentence of death.

The Government's brief does not recite the Miller murder as amenable to its "separate acts" theory. However, it could be argued that Beckford possessed the intents reflected in subsections (n)(1)(C) and (D). That might present a closer question than was the case

of Ambrose because of the similarity of the intents defined in subsections (C) and (D), respectively.

Accepting as established the evidentiary proffers and Smith's version of events, it appears that Beckford could not qualify for the death penalty under subsection (n)(1)(A), because he did not kill Miller, or under subsection (n)(1)(B), because he did not inflict the fatal injury. However, Beckford conceivably could be found eligible under subsection (n)(1)(C) because, by instructing Dennis to shoot, Beckford intentionally engaged in conduct intending that the victim be killed or intending that lethal force be employed and death was the result. Likewise, Beckford conceivably could be found eligible under subsection (n)(1)(D) because he animated Dennis to action knowing that there was grave risk to Miller and death resulted. But, if the jury were to find that Beckford's intent was that proscribed in subsection (n)(1)(C), then that finding would necessarily subsume the intent proscribed in subsection (n)(1)(D). On the other hand, if the jury found that Beckford acted with the intent set forth in subsection (n)(1)(D), then the jury necessarily would have concluded that, although Beckford knew his conduct would create a grave risk of death, he did not specifically intend that Miller be killed or that lethal force be used against Miller. That finding would preclude the jury from relying on subsection (n)(1)(C).

Section 848's statutory scheme, therefore, requires the jury to focus on each (n)(1) circumstance individually, and to decide which, if any, intent the defendant possessed in connection with the act that caused the death which makes the defendant eligible for the death penalty. That, of course, is as it should be because it requires the jury to associate intent and cause of, or resulting, death in deciding threshold eligibility for the death penalty.[10]

In sum, the reasons that rendered the "separate acts" theory an unacceptable interpretation of Section 848(n)(1) as applied to the Ambrose murder also renders the theory equally inapplicable to the Miller murder.[11]

### 4. The Weighing Process Would be Unconstitutionally Skewed Were the Jury Permitted to Find More than One Intent

The weighing of the (n)(1)(A)–(D) circumstances by the jury in the balance of aggravating and mitigating factors under Section 848(k) makes it even more imperative that only one of the (n)(1) circumstances is permitted to be found. This is the teaching of *Tipton*, which more clearly reveals the flaws in *Flores*.[12]

In *Tipton*, the Fourth Circuit seemed to view the required subsection (n)(1) intent standards as alternative ways of finding one factor—criminal intent. Indeed, in its harmless error analysis, one of the prejudices about which the Court of Appeals expressed concern was that, by permitting the jury to find all four of the (n)(1) circumstances, the district court possibly had permitted a finding on an "unfair quantitative basis that gave four-fold effect to what was essentially a single factor—criminal intent." *Id.* at 900. The Fourth Circuit also clearly articulated its concern that multiple findings of this single intent would unconstitutionally skew the weighing process. *As* discussed above, the Court explained, "[t]o allow cumulative findings of these intended alternative circumstances, all of which do involve different forms of criminal intent, runs a clear risk of skewing the weighing process in favor of the death penalty and thereby causing it to be imposed arbitrarily, hence unconstitutionally." *Id.* at 899.

That rationale applies here. For example, if the jury weighs Beckford's intent during

---

10. It is possible that a factual scenario could develop which supports the Government's "separate acts" theory. But, that has not been presented here.

11. The Sugar Bottom murders alleged with respect to defendants Cazaco and Thomas do not appear to involve this issue.

12. Although *Tipton* clearly held that the jury should find only one of the subsection (n)(1)(A) through (D) circumstances as the basis of the required (n)(1) aggravating factor, the Fourth Circuit did not address the precise question addressed by *Flores*.

the commission of the murder at the time he allegedly shot Ambrose, as well as Beckford's intent during the commission of the murder at the time he allegedly procured Dennis' assistance, the weighing process could be skewed if the jury gives two-fold effect to what is essentially one factor—the defendant's intent in committing the conduct which resulted in Ambrose's death. The same result would obtain as to the Miller murder (involving factors (n)(1)(C) and (D)).

## C. Conclusion

For all of these reasons, the Court rejects the Government's theory as to the application of the intent circumstances in Section 848(n)(1). The jury may consider any (n)(1) circumstance, which is supported by evidence, but may find only *one* of the submitted factors, even if more than one intent is supported by more than one act which occurred during the commission of the alleged murder. This approach is statutorily sound and is more attune to *Tipton's* reasoning.

In so holding, the Court reiterates that it does not seek to preclude the Government from offering evidence of the defendants' relevant conduct in committing the offense. To the contrary, if appropriate, the Government may offer such evidence (including the request for Dennis' assistance in the Ambrose murder), along with any other evidence, which it seeks to use as proof of *one* of the intent circumstances contained in Section 848(n)(1). In the alternative, if appropriate, the Government may use the information as evidence of another statutory or non-statutory aggravating factor, such as that the defendants committed the offense after substantial planning or premeditation. The purpose of today's decision is simply to prevent the jury from being diverted from its important task of determining whether the defendants possessed an intent that meets the constitutional minimal threshold and also in distinguishing between those defendants thought to be deserving of the death penalty from those thought not to be. This ruling also seeks to prevent the unconstitutional skewing of the weighing process, which could not be assured if the jury were permitted to find more than one (n)(1)(A)–(D) circumstance, based on,

what is for all purposes, one intent, the intent of the defendant during the crime which resulted in the victim's death.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.